MISSOURI PACIFIC RAILROAD COMPANY, ET AL., v. MAXWELL.

4-4797

Opinion delivered November 8, 1937.

*R. E. Wiley* and *Richard M. Ryan,* for appellants.

*Glover & Glover,* for appellee.

HUMPHREYS, J. Appellee, R. L. Maxwell, father of Charles Ray Maxwell, brought suit in the circuit court of Grant county against appellants to recover damages in the sum of $15,000 for himself and as administrator of the estate of his son, alleging that on April 16, 1935, through the negligent operation of one of the passenger trains of the Missouri Pacific Railroad Company his son, who was eighteen months of age, was run over and killed about 2:30 o'clock P. M., three-fourths of a mile south of Kirkland.

The specific negligence alleged was that the employees of said railroad company in operating the train failed to keep a lookout for persons on or dangerously near its tracks and that they failed to ring the bell, blow the whistle, or give any other sound of alarm until within a few feet of the child and ran over and killed him, resulting in suffering and death.

Appellants filed separate answers, denying any negligence in the operation of the train and pleading in bar of the action negligence on the part of R. L. Maxwell in allowing the child to go upon the track.

The cause was submitted to a jury on the pleadings, evidence adduced by the respective parties and instruc-

tions of the court, resulting in a judgment in favor of appellee for $5,000, from which is this appeal.

The facts, revealed by the record, stated in the most favorable light to appellee, are, in substance, as follows:

Appellee resided with his family about four hundred feet east of the track. His home was enclosed with a fence. There was a gate on the west side which fastened with a latch. There was a pathway leading by his home to and across the track to the highway on the west side of and parallel to said track, which pathway was used by the public. The track was straight and level from this private crossing north to Kirkland. There were no obstructions of any kind between the private crossing and Kirkland to prevent the engineer and fireman from seeing anyone on the track at or near the crossing. The day the child was killed by the railroad company was a clear and bright day. About ten minutes before the train ran over the child, it was watching its father build a fence in the back yard. Its mother came out and took it in the house, but it went out into the front yard and from there to the railroad track and had gone about twenty feet on the track toward Kirkland when it was caught by the train and dragged for about forty feet to the place it was supposed to have been killed. At that point, blood was discovered and when the child was picked up there was a hole in its head. After the train ran over and killed the child, it ran about five hundred to eight hundred feet before it stopped. The record does not reflect whether some part of the train struck the child on the head or whether at that point its head hit a tie. At that particular point a few ties were higher than the others. When picked up the child was dead. The train ran over the child before its parents discovered it had left the house and gone over to the railroad track. This was the first time it had gotten out of the yard and gone to the railroad track. Appellee was still working on the fence when informed that the train had run over the child. He thought it was still in the house with its mother.

According to the testimony of S. A. Jones, the engineer who was operating the train, the train was moving at a speed of about forty-five miles an hour, and the engi-

neer observed an object on the track one thousand or twelve hundred feet in front of the train and, thinking it was a piece of paper, the engineer paid little attention to it until within five hundred or six hundred feet of it, at which time he discovered it was a child and immediately applied the emergency brakes and blew short blasts of the whistle, but was unable to stop the train before running over the child. He stated that had he realized it was a child when he first observed the object he could have stopped the train and avoided killing it.

Several of the witnesses testified that when the engineer blew the short blasts of the whistle the train was right upon the child. One witness testified that he was plowing within three hundred feet of the child and that the engineer waived his hand at him and gave him what is called a ''high-ball'' in passing. An examination of the track indicated that the emergency brakes were first applied when the train was within about 75 feet of the child. One witness testified that her attention was attracted by the short blasts of the whistle and that just as she turned her head the train ran over the child. The testimony of the engineer taken in the federal court on motion to remand the cause to the state court was to the effect that when he discovered the object was the child he was six hundred or seven hundred feet from it. His testimony in the two courts conflicted in other material respects. The court admitted a picture of the child taken two or three months before its death in evidence over the objection of appellant.

Attorneys for the railroad company argue that the court erred in submitting to the jury the question of its liability on the lookout statute, contending that the undisputed evidence reflects that it kept an efficient lookout and discovered the child on the track as soon as it reasonably could under all the facts and circumstances, and that after discovering the child all was done that could have been reasonably done to avoid killing it. The lookout statute is as follows:

''It shall be the duty of all persons running trains in this state upon any railroad to keep a constant lookout for persons and property upon the track of any and

all railroads, and if any person or property shall be killed or injured by the neglect of any employee of any railroad to keep such lookout, the company owning or operating any such railroad shall be liable and responsible to the person injured for all damages resulting from neglect to keep such lookout, notwithstanding the contributory negligence of the person injured, where, if such lookout had been kept, the employee or employees in charge of such train of such company could have discovered the peril of the person injured in time to have prevented the injury by the exercise of reasonable care after the discovery of such peril, and the burden of proof shall devolve upon such railroad to establish the fact that this duty to keep such lookout has been performed." Crawford & Moses' Dig., § 8568.

In construing the lookout statute quoted above our court is committed to the rule that in order for one to recover damages under the statute he must prove facts and circumstances from which the jury might reasonably infer that the danger might have been discovered and the injury avoided if an efficient lookout had been kept, and that the burden to make such proof rests upon the party seeking to recover. *St. Louis-San Francisco Ry. Co.* v. *Sheppard, ante p.* 619, 109 S. W. (2d) 109.

We think the facts and circumstances detailed above were sufficient to warrant a jury in finding that appellant might have discovered the danger and avoided killing the child had the engineer kept an efficient lookout. The track was straight and level for more than a quarter of a mile. The day was clear and bright. The child was eighteen months old and, according to its picture, was of average size. According to the evidence introduced by appellee, the child was not discovered by the engineer until the train was within about seventy-five feet of the child. At least nothing was done to prevent the injury until the train was practically upon the child. The train could have been stopped, according to the engineer's evidence, within one thousand or twelve hundred feet. According to one witness, the engineer waived to him out in a field when only a short distance from the child. We think it a reasonable inference from all facts and circumstances

that if the engineer had been keeping a constant lookout he could have discovered the child and avoided killing it by stopping the train. At least there are facts and circumstances in the evidence tending to show that he could have done so.

This issue was submitted to the jury under correct instructions given at the request of both appellant and appellee. We have read the instructions and they conform to the rule laid down by this court in interpreting the lookout statute.

Appellant, also, argues that the court should have given a peremptory instruction in its favor because the undisputed evidence reflects that appellee was negligent in allowing his child to go upon the track. We think there is little or no evidence tending to show any negligence on the part of appellee in this regard, but, to say the least of it, the evidence might be regarded as conflicting and the court submitted this issue to the jury under correct instructions. There is substantial evidence in the record to support the finding of the jury to the effect that appellee was not negligent in allowing his child to go upon the track.

Appellant also contends that the court erroneously admitted the picture of the child in evidence. The size of the child was in question and the picture had been taken only a short time before the child was killed; so, for that purpose, it was admissible.

Appellant also contends that over its objection the attorney for appellee was permitted to state to the jury that the mother loved her child and that she would continue to suffer mental anguish and to compare the love for his own child with the love of the mother for her child and that the judgment should be reversed for this reason. When objection was interposed to the argument by appellants' attorney the court said to the jury:

"Gentlemen of the jury, the only purpose of the argument made by counsel to the jury is to refresh your memory as to what the testimony of the witnesses was. If any lawyer argues anything that is not supported by the testimony you will disregard that part of the argument." Appellee had sued for $15,000 and recovered

only $5,000. We think the amount of the recovery indicates very clearly that the minds of the jury were not influenced or inflamed by the argument, and in reaching their verdict they did not consider the argument, but followed the advice of the court to disregard any argument made by an attorney that was not supported by the testimony. Of course, the argument was improper and should not have been made, but in view of the amount of the recovery as compared with the amount sued for we cannot say that the improper argument in any way prejudiced appellants' rights.

Appellant contends that the court erred in giving instruction number ten, which is as follows:

"You are instructed that where damages are claimed for the death of a child incapable of earning anything or rendering services of any value, the value of its probable future service to the parent during its minority is a matter of conjecture and may be determined by the jury without the testimony of witnesses," and in giving instruction number eleven, which is as follows: "You are instructed that a father in his own right is entitled to recover for the negligent killing of his son, whatever sum the son would have earned until he was twenty-one years of age, less his reasonable expenses."

We think these two instructions are correct declarations of law as applied to the facts in this case. There is no way to prove the earning capacity of a child of this age, but there can be no question that the services of a boy child for nineteen or twenty years would amount to a considerable sum and that a father should receive a reasonable compensation for the loss of its services less the reasonable expenses of rearing the child. The funeral expenses amounted to about $250, and there is some evidence in the case that the child was not immediately killed and the jury would have been warranted under the evidence in finding that the child was dragged some forty feet before he was killed, in which event its suffering must have been great. We do not think $5,000 an exorbitant amount or that the amount is excessive.

Appellant, also, contends that the judgment should be reversed because the attorney of appellee read the

instructions prepared by him and approved by the court to the jury. It is the better practice for the court to read the instructions to the jury himself, but the jury certainly understood that the instructions which were read were instructions given by the court. It does not appear that appellant was prejudiced by any particular emphasis placed upon the instruction by the attorney for appellee in reading them. The practice of permitting attorneys to read the instructions should be discontinued and the trial court should read them to the jury himself.

Appellant objected to a great many of the instructions given by the court at the request of appellee, and, has argued his objections extensively and also excepted to the refusal of the court to give certain instructions asked by appellant and has argued these exceptions extensively. We have carefully read the instructions given and refused by the court and find no inherent and prejudicial errors in the instructions given. We think the court correctly refused to give certain instructions asked by appellant. After carefully reading the evidence and the instructions, we think the law as declared by the trial court was correctly declared, and that appellant has received a fair and impartial trial in the case.

No error appearing, the judgment is affirmed.

SMITH and BAKER, JJ., dissent.