J. A. SMITH, a Minor, by SARAH SMITH, His Next Friend, v. GUY A. THOMPSON, Trustee of the Missouri Pacific Railroad Company, a Corporation, Appellant.—142 S. W. (2d) 70.

Division Two, July 3, 1940.*

*NOTE: Opinion filed at September Term, 1939, May 4, 1940; motion for rehearing filed; motion overruled at May Term, 1940, July 3, 1940.

504

*Thos. J. Cole, Fred W. Barrett* and *David E. Blair* for appellant.

*Sizer & Myres, Franklin E. Reagan* and *Harry G. Waltner, Jr.,* for respondent.

ELLISON, P. J.—The respondent James Smith, a boy eleven years old at the time, sustained injuries while riding in a stock truck which was struck by a Missouri Pacific three-car passenger train at a rural highway crossing near Sulphur Springs in Benton County, Arkansas, on December 19, 1936. By next friend he brought a tort action in Newton County, Missouri, against the appellant Guy A. Thompson, trustee in charge of the railroad, for personal injuries sustained in the collision, and recovered a judgment for $10,000 in the Lawrence County

circuit court on change of venue. The assignments of error on this appeal complained of the wrongful admission and exclusion of evidence and of the giving and refusal of instructions.

The train involved was traveling west and the truck north. According to the evidence for respondent the wagon road was low, gradually rising until it inclined steeply upward for a perpendicular distance of six feet over a span of fifteen feet reaching almost to the south side of the railroad track; and the rails stood practically their full height above the ground because of the absence of gravel between them and on the outside, making the crossing rough. On the south side of the railroad and the east side of the roadway clear back to the right of way line there were trees, bushes and shrubbery. These, together with the lowness and final steep incline of the wagon road and the fact that several hundred feet east the railroad track passed through somewhat of a cut with vegetation on the sides, hid westbound trains from an observer in the truck seat on the roadway 12 or 15 feet south of the track, until the train had come within a certain distance from the crossing. What that distance was, was a question upon which even respondent's witnesses disagreed. Casey estimated it at 50 to 60 feet. Mrs. Casey stated you couldn't see the train at all at that point. Jimmy Sherrill, a fourteen year old eyewitness, thought it would be about 300 feet. Neal Troy said you couldn't see "very far."

The truck was a 1½ ton Ford, 26 feet long over all, with a slat body adapted to hauling stock. The respondent and another boy named James Pierce were riding in the body, which was otherwise empty, and the driver and his wife, Mr. and Mrs. Melvin Casey, on the seat in the truck cab. They testified that Casey approached from the south and stopped the truck on the inclined roadway so that the driver's seat was 12 to 15 feet from the track. The two boys were indefinite as to the distance from the stopping point to the track, but agreed that the truck did stop. All four neither saw nor heard a train after looking and listening. Casey then started up in low gear traveling about two miles per hour, and when the front wheels of the truck had got between the rails Mrs. Casey saw the train coming and screamed.

Casey continued at the same speed across the bumpy rails, and the locomotive hit the truck body about three or four feet from the rear end, knocking it into the right-of-way north of the track. He was busy trying to get the truck on across the track after his wife screamed, and didn't see the train at all. But Mrs. Casey and the respondent agreed that it came into their view as it was passing through or emerging from the cut east of the crossing. The distance between the west end of the cut and the crossing was about a quarter of a mile (1320 feet) according to respondent's witness Sherrill, and about 600 feet as estimated by respondent's witness Fowler. The railroad brakeman thought it was 400 feet and the train porter 1200 or 1500 feet. The

section foreman measured it and said he found the distance to be 316 feet.

The collision occurred a little after noon. The day was clear—some witnesses said the sun was shining. The slat body of the truck had two white wagon canvasses over it, making it plainly visible as the vegetation was brown and leafless. We do not find any direct evidence on the point but a photograph of the truck, which appellant introduced without objection, shows a third of its length, or 8 feet 8 inches projected ahead of the driver's seat, which means the forward end of it was 3 feet 4 inches to 6 feet 4 inches from the track when it stopped with the driver's seat 12 to 15 feet therefrom. If the truck almost cleared the locomotive and was struck about four feet from the back end, it had moved 30 to 33 feet when the engine struck it. If it progressed at the rate of two miles per hour, it took over ten or eleven seconds to travel that distance.

Mrs. Casey testified the train did not whistle or sound the bell before the collision. In this she was corroborated by some neighboring witnesses who said they heard neither; but the train crew and several disinterested non-employees swore to the contrary. Mrs. Casey also said it did not check its speed. Respondent's eyewitness Fowler declared the train did not appreciably slow up until it reached a certain telegraph pole 156 feet west of the crossing, and that it stopped three poles or 528 feet beyond that, making a total distance of 684 feet. But the other witnesses on both sides pretty well agreed that the rear end of the train stopped about 200 feet west of the crossing, and as its length was close to 290 feet the locomotive must have run about 490 feet after the collision. The respondent's witnesses estimated the speed of the train at 55 miles per hour, which is 80.66 feet per second. It was over an hour behind schedule. If it was true, as respondent's witnesses testified, that that speed was sustained until or after the collision, the train traveled 807 to 887 feet during the ten or eleven seconds it took the truck to move from its standing position to the point of the collision.

The appellant's witnesses denied that trees, vegetation and shrubbery shut off a view of the train from the point where Casey stopped the truck, and presented photographs and witnesses to the contrary. Respondent declared that trees and shrubbery had been cut down prior to the taking of the picture four days after the collision. This was vehemently denied by the section men. The engineer did not see the truck until the fireman warned him, because he was on the opposite side of the cab. He and the fireman both declared he immediately put the brakes in emergency and sounded the alarm whistle. They said the train speed was only forty miles per hour, the engineer explained that he was running a little slower than he otherwise would because he had found a rough piece of track in that vicinity on his last trip. The testimony of the train crew accorded generally with

this version as to the use of the emergency brakes and warning signals, but they were not so certain as to the distance of the engine from the crossing when the brakes were applied.

The fireman testified that he could have seen a truck in the position where the respondent's witnesses say the truck stopped, for a distance of a quarter of a mile down the track. The track was straight that far, and there was nothing to obstruct his view. He actually did see it when the train was in the cut about 400 feet away from the crossing and the truck was coming up to the right-of-way pretty fast. Then he saw it stop ten or twelve feet from the crossing. Appellant next started to prove by the fireman that when the truck stopped he thought it was going to wait for the train to pass; but the court excluded the testimony, and limited the witness to what he saw. Continuing the witness stated that as soon as the truck started up after waiting a second (Casey said it stood five or six seconds) he warned the engineer, who applied the emergency brakes about 200 feet from the crossing. The fireman also said Casey ran the truck across the track at five or six miles per hour.

Respondent concedes the enginemen for 1320 feet could have seen the truck where it stopped, though still insisting the truck passengers could not see the train because of the obstructions already mentioned. His theory is that because of the elevated position of the fireman in the locomotive cab, some ten feet above the ground, and the facts that the truck body with the white sheets over it was several feet higher than the driver's head, and the nose of the truck projected well forward of the driver's seat—for these reasons he says the fireman could have seen the truck notwithstanding the obstructions. Other facts will be stated as necessary in the course of the opinion.

Appellant's first assignment is that the trial court erred in refusing to permit his counsel to cross-examine Mrs. Casey about her interest in this case, and concerning the triviality of her injuries sustained in the same collision, for which she had a suit pending against appellant for $15,000. We think the trial court was liberal enough. Counsel was permitted to go into that matter by asking her twenty-two questions covering about two pages of the abstract. During that examination only one objection was sustained, and that was when the witness was asked, "You haven't been injured at all, have you?" Nevertheless she was interrogated fully about her injuries. Granting that this cross-examination on a collateral matter was proper, we think the trial court had a discretionary right to end it.

Next error is assigned on the court's limitation of the appellant's cross-examination of the respondent's witness Fowler. He was asked if he had ever been convicted of a crime and denied it. Then he was asked if he had ever been *charged* (!) with a crime and incarcerated for several months and he denied that. The next question

was whether he had tied himself to a tree and claimed he had been robbed, and he answered in the negative. The question was repeated and answered the same way, and an objection sustained. Appellant's counsel then insisted that the witness be allowed to answer, and on his attention being called to the fact that the witness had already answered, said "All right." Later counsel reverted to the subject and asked the witness if it was true that he had been tied to a tree and robbed, and an objection was sustained on the ground that the matter had already been ruled upon. It was immaterial if the witness had in fact been thus robbed, and he had already denied making any such claim. Such discrediting questions may be asked for the purpose of impeaching a witness, but the party is bound by the witness' answer. [State v. Bagby, 338 Mo. 951, 964, 93 S. W. (2d) 241, 248(11).] We see no error in the court's ruling.

Complaint is made also because the court refused to strike out an answer of the same witness. The witness had gone to the scene of the wreck and picked up the boy Pierce. Upon being asked, "What did you do with him?" the witness answered "I carried him down to the engine and laid him down. It looked like he was dead, and I thought he was." Appellant's counsel then asked that "that answer be stricken out"—the whole answer. Appellant's brief contends the subject matter was immaterial and the statement that the witness thought the boy was dead tended to inflame the jury. Since there was no objection to the question, the objection made was directed to the whole answer, and counsel did not claim surprise or that the last part of the answer was not responsive, we think there was no error.

The next assignment challenges the trial court's rulings growing out of this incident. During the direct examination of the respondent's expert witness, Dr. Lyons, the plaintiff was brought before him stripped to the waist, and the doctor pointed out certain muscles and the course of certain nerves, and had the boy make certain movements of his right arm and shoulder. He then called upon the boy to make similar motions with his left arm and shoulder, which the boy answered he could not do. (The respondent's claim was that he suffered from paralysis of the left arm and shoulder as a result of the collision.) Appellant's contention here is that this demonstration and exhibition were calculated to inflame the jury. In support of it he cites: Myer v. Johnson, 224 Mo. App. 565, 568-9, 30 S. W. (2d) 641, 642(1); Riepe v. Green (Mo. App.), 65 S. W. (2d) 667, 668(2); Willis v. Browning, 161 Mo. App. 461, 143 S. W. 516.

In the Myer case the demonstration before the jury was accompanied by expressions of pain from the plaintiff. The Riepe and Willis cases practically hold that while an exhibition to the jury of an injured part of the body may sometimes be permitted, it is error to give a demonstration of how the injured member functions or fails to function. But it has been said by this court that such matters rest somewhat with-

in the discretion of the trial court because of its better opportunity to judge the effect. [Boyer v. Mo. Pac. Rd. Co. (Mo. Div. 1), 293 S. W. 386, 388(4).] And in Mahmet v. American Radiator Co. (Mo. Div. 1) 294 S. W. 1014, 1016(7), the plaintiff was allowed to demonstrate to the jury how much (or little) she could manipulate her injured hand. [See also Lyon v. St. L., I. M. & S. Ry. Co., 6 Mo. App. 516, 517; Houston v. C., R. I. & P. Ry. Co., 118 Mo. App. 464, 471, 94 S. W. 560, 562; Timmerman v. Frankel, Frank & Co., 172 Mo. App. 174, 185, 157 S. W. 1051, 1054; Kuether v. K. C. L. & P. Co., 220 Mo. App. 452, 461, 276 S. W. 105, 110.]

We think the demonstration by respondent's doctor was rather protracted and somewhat dramatic. But in view of the fact that there were no wounds or deformities to disclose, that there were no exclamations of pain but on the contrary the boy seems to have acted and answered composedly, that there was little or no chance for malingering by a boy 11 years old, and that appellant does not claim the verdict was excessive—for these reasons we have concluded there was no reversible error, though not approving the practice except where necessary and safeguarded. In Meeker v. Union E. L. & P. Co. (Mo. Div. 1), 216 S. W. 933, 935(5) the exhibition to the jury of the entire body of a 14 year old boy who had been badly burned by electricity, was held not reversible error. In Turnbow v. K. C. Rys. Co., 277 Mo. 644, 657-8, 211 S. W. 41, 45(6) the healed over stumps of both legs of a three year old boy were shown to the jury, the object being to demonstrate that the bone had grown out so as to press against the skin, necessitating another amputation. Even this was held within the discretion of the trial court. These cases go far beyond what was done in this cause. Such demonstrative evidence is admitted under proper restrictions in other states, 103 A. L. R., p. 1355, note. We see no ground for interference here.

Another assignment charges error in the refusal of appellant's instruction A, which would have withdrawn from the jury all evidence respecting alleged conditions and obstructions in the roadway *behind* the point where the truck stopped. Appellant's theory is that since the truck did stop in a safe place, it was wholly immaterial how much the view was obstructed or what the conditions were along the part of the roadway it had already negotiated. In making this contention appellant overlooks the testimony of his own witness, the fireman, who testified that beginning as far back as a quarter of a mile along the track he could see the truck moving across the right-of-way until it stopped. Respondent had a right to combat that testimony; also to show the persons in the truck could not see the train at any time before they reached the track. Further the evidence struck at impeaches appellant's photographs.

The next three assignments practically amount to a demurrer to the evidence. They complain of the giving of respondent's in-

structions 1 and 2 and of the refusal of appellant's withdrawal of instruction D on the ground that there was no evidence warranting the submission to the jury of the questions whether appellant's enginemen negligently failed to keep a constant lookout for persons on or near the track and to slacken the speed of the train enough to avert the collision. We have already set out the facts rather fully, and can only say we disagree with appellant on the merit of these assignments.

Under respondent's evidence the truck moved across the track at a speed of two miles per hour, or 2.93 feet per second. Since it was struck three or four feet ahead of the back end, it would have been out of the way in a little more than a second. During the ten or eleven seconds that elapsed while the truck was spanning the 30 or 33 foot distance from where it stopped to where it was hit, the train at a sustained speed of 55 miles per hour (as respondent's witnesses said) traveled 807 to 887 feet. After the collision it came to a stop in about 500 feet. If all this is true no further testimony was necessary to raise a warrantable inference that the enginemen could have checked its speed sufficiently to have avoided the collision. The same facts would support another substantial inference that the train continued at full speed because the enginemen failed to keep a constant lookout and discover the truck when it could have been seen—unless we accept as conclusively true the testimony of the fireman that he saw the truck but did not warn the engineer because he thought it would wait for the train to pass, until the truck started up when the train was 200 feet from it.

We are aware that some of respondent's evidence may seem improbable. But the appellant's theory is not entirely convincing, that with emergency brakes set 200 feet east of the crossing the light three-car train moved 700 feet before it stopped, and this though running only 40 miles per hour in the beginning. At that uniform speed the train would have traversed the 200 foot distance in 3.4 seconds. That would have been possible according to the engineer's testimony, for he said three or four seconds are required for the emergency brakes to take effect. During the interval the truck would have moved only ten feet, which certainly would not have permitted the back end of it to reach the far rail of the track—unless the fireman's testimony is true that it was going five or six miles per hour up a steep incline and over a rough crossing from a standing start. At that speed it would have been just about where respondent's witnesses put it; but on the same hypothesis the back four feet of it would have cleared the locomotive in a half second or less if the train had been retarded enough to put it back 30 feet from the crossing when that half second began.

Further, the fireman testified the emergency air brakes take effect in a second or a little more. If that is so they would have been operating for two-thirds of the 3.4 seconds it would have taken the train

to cover the 200 foot distance even at an *undiminished* speed of 40 miles per hour. And if it is a fact, as respondent's witnesses aver, that the bell and whistle were not sounded and that trees and shrubbery hid the train from the view of the truck passengers—in other words, if they did not know the train was coming and the enginemen had good cause to realize it—then the fireman had no right to assume they would wait for the train to pass. [Clark v. A., T. & S. F. Ry. Co., 319 Mo. 865, 879, 6 S. W. (2d) 954, 960.]

We understand thoroughly that appellant denies the truth of much of respondent's evidence, but, as his counsel concede in their brief, we must accept it. This is a typical jury case based on conflicting evidence as to nearly every essential fact. Some of the evidence is rather hair-splitting as to time and distances, but giving respondent the benefit of the testimony and inferences most favorable to him, we think he made a prima facie showing on the issues of failure to keep a constant lookout and slacken the speed of the train. This conclusion is based on the fact that the truck came so near to escaping and circumstantial evidence indicating the train could have been checked enough to let it get by. [See: Meese v. Thompson, 344 Mo. 777, 129 S. W. (2d) 847, 850(2); Gann v. C., R. I. & P. Ry. Co., 319 Mo. 214, 226, 6 S. W. (2d) 39, 43; St. L. S. W. Ry. Co. v. Braswell (Ark.), 127 S. W. (2d) 637, 638; Mo. Pac. Rd. Co. v. Maxwell, 194 Ark. 938, 941, 109 S. W. (2d) 1254, 1256.]

Finally, appellant complains of the refusal of its instruction B which stated in substance that if the whistle or bell were sounded for the statutory distance until the crossing was reached; and "the fireman on said engine did not see the truck after it had stopped near said crossing, about to be driven over said crossing in front of said train, in time to have stopped said train or to have slowed down the speed thereof, or caused the engineer to do so, and thus could have reasonably have avoided such collision;" and that the crossing was reasonably safe for vehicular traffic; then the jury should find for defendant.

We hold the instruction was properly rejected. It appears to have been drawn on one of two theories: (1) that there was no substantial evidence of failure to keep a constant lookout (which contention we have already rejected); or (2) that if the whistle or bell were duly sounded, the fireman was relieved of keeping a constant lookout; and that unless he did see the truck after it had stopped at the crossing and was about to be driven thereover, in time to have averted the collision, then the plaintiff could not recover. This ignores the fireman's duty under the Arkansas statute to keep a constant lookout. [Sec. 11144, Pope's Digest; Sec. 8568, Crawford & Moses' Digest. For statute see Oxford v. St. L.-S. F. Ry. Co., 331 Mo. 1. c. 58, 52 S. W. (2d) 1. c. 984.] Suppose when the truck started up the train was far enough back from the crossing for the fireman to have re-

tarded it and thereby prevented the collision, *if* he had kept a *constant* lookout—then undoubtedly the respondent would be entitled to recover.

One assignment of error complains of the trial court's refusal to permit the fireman to testify that when he saw the truck draw up to the crossing and stop, he *believed* it would wait for the train to pass. The assignment is not mentioned in Appellant's Points and Authorities and Argument, though it is referred to in his ''Argument in Reply to Brief of Respondent.'' This was not enough to preserve it for appellate review. [3 West's Mo. Dig. secs. 761, 1075, 762.]

Finding no reversible error, the judgment is affirmed. All concur.

