CLYDE TEAGUE v. PLAZA EXPRESS COMPANY, a Corporation, and CARL COLLIER, Appellants.—No. 39377.—190 S. W. (2d) 254.

Division One, November 5, 1945.

*R. F. Baynes* and *Langdon R. Jones* for appellants.

*Ward & Reeves* and *Hal H. McHaney* for respondent.

584

 VAN OSDOL, C.—Action to recover $10,000 damages for the death of plaintiff's husband. The jury returned a verdict for defendants, but the trial court sustained a motion for a new trial. Defendants have appealed.

Respondent-plaintiff's husband, H. M. Teague, was killed in the collision of a Chevrolet sedan, in which he was riding and which was driven by his (and plaintiff's) daughter, and a semi-trailer truck owned by defendant Plaza Express Company and driven by defendant Carl Collier. Heretofore appellate courts have reviewed other cases arising out of the tragedy. See White v. Teague, Mo. App., 177 S. W. 2d 517; White v. Teague, Mo. Sup., 182 S. W. 2d 288; and White v. Plaza Express Co., Mo. App., 188 S. W. 2d 847.

 Plaintiff's case was submitted to the jury upon negligence under the humanitarian rule in failing to sound a warning, or to stop or slacken the speed of the truck.

The trial court sustained the motion for a new trial "because of error of giving instruction No. 7 D concerning sudden emergency for the same is not supported by the evidence or any action of driver predicated upon it."

Appellants-defendants assign errors of the trial court (1) in sustaining the motion for new trial—they assert the case involved the "emergency doctrine" and the defendants were entitled to submit to the jury the sudden emergency theory as incorporated in Instruction Number 7 D; and (2) in overruling defendants' demurrers to the evidence. We will first attend the latter assignment.

The collision occured on September 20, 1941, about 7:30 P. M., at the intersection of Route U (Pemiscot County) and U. S. Route No. 61. Route U is an east-west highway and intersects U. S. Route No. 61 at a right angle. A curved concrete roadway across the southeast angle of the intersection also connects the two highways. A house, a filling station and some trees are situate on the right, as the curved roadway curves away from U. S. Route No. 61. The Teague automobile (in which plaintiff's husband was riding) had been driven westwardly on Route U, and the defendants' truck northwardly on U. S. Route No. 61. It had been a clear day, though it had become dark; the roadways were dry; and the scene is surrounded by level terrain. Both vehicles displayed lights. The Teague automobile had moved at a speed of about fifty miles per hour and was

driven into the side of defendants' truck, striking it a little in front of the center of the trailer. The speed of the Teague automobile had not been slackened prior to the collision; the driver did not notice signs warning of an approach to U. S. Route No. 61 and did not see defendants' truck. Defendants' truck had been driven northwardly on U. S. Route No. 61 at a rate of speed of about thirty-five miles per hour. The driver, defendant Collier, had observed the Teague car approaching from the east when it was "a mile or so" away. "The next time I observed them after observing them up the road was not until I got past the house and trees and filling station where I could see up the road. I would say I was about 200 feet from the intersection when I looked up there. I couldn't tell how far I thought the car approaching from the east was from the intersection. It would just be an estimate. About 300 feet. Just a guess . . . " He had seen another automobile driven by one Thompson coming from the west on Route U. The Thompson car stopped west of the intersection to await the passage of defendants' truck when the truck was yet a distance of 400 or 500 yards south of the intersection. As defendant Collier approached, he continued to observe the Teague and Thompson cars, "I looked from one to the other." There was evidence tending to show that, as defendant Collier drove the truck northwardly and reached a point 290 feet south of the intersection, he had an unobstructed view along Route U to a point 360 feet east of the intersection. He was an experienced truck driver, and was familiar with the intersection and the physical surroundings. He did not sound a warning nor did he apply the brakes at any time prior to reaching the intersection. It was his further testimony that the trailer-truck was about 38 feet in length. It was equipped with two brakes, one operated by hand and one by the foot. The hand brake operated to arrest the trailer, and the foot brake the tractor; the speed of his equipment would be more safely slackened or stopped by applying the hand brake to the trailer "just a fraction ahead" of the application of the foot brake to the tractor. It would take a "second or so," from the time "my mind flashed the warning," to operate the brakes and for the brakes to "take hold." After the brakes took hold, 70 or 80 feet were required, when moving thirty-five miles per hour, to bring the equipment to a stop. There was testimony that a Chevrolet sedan, such as the Teague automobile, moving at the rate of fifty miles per hour, could be stopped at a distance of 175 (or 189) feet.

Defendant Collier, as stated, saw the Teague automobile approaching on Route U when it was a mile or more from the intersection; and, as stated, as he came to a point 290 feet from the intersection, he could have again seen eastwardly along Route U to a point 360 feet from the intersection. It is apparent, however, that, when the truck was 290 feet south of the intersection, the Teague automobile (mov-

ing at fifty miles per hour) had not progressed to a point 360 feet from the intersection, but was yet about 414 feet to the ▮▮▮ eastward—so the defendant Collier, as he approached nearer to the intersection, came to a point where he could have seen the Teague automobile when it was *more* than 360 feet, that is, more than 4.9 seconds from the intersection.

It is the position of defendants-appellants that there was no duty of defendants to act under the humanitarian rule "unless and until a situation of peril comes into existence"; and that, until the Teague automobile reached a distance within which it could not be stopped short of the intersection, defendant Collier was entitled to assume that the automobile would be stopped before it reached the intersection. And, it is urged, since there was testimony tending to show that the automobile could have been stopped at a distance of 175 feet, the defendant Collier had no duty to act until the automobile came to a point 175 feet from the intersection, and continued on at unretarded speed, at which time defendants' truck was but 2.38 seconds from the point of collision—too late, appellants say (considering reaction time), to thereafter sound the horn, slacken speed, or stop the truck and so avert a collision. Assuming 2.38 seconds to have been insufficient for defendant Collier with the means at hand to have averted the collision, defendants' position might be correct—if there had been nothing shown in evidence of the movement of the Teague automobile (or in the demeanor or conduct of its occupants) which should have made it reasonably apparent to one in the exercise of the highest degree of care that the driver of the Teague automobile was oblivious of the intersection and of the approach of defendants' truck, and did not intend to stop. State ex rel. Thompson v. Shain et al., 349 Mo. 27, 159 S. W. 2d 582; Womack v. Mo. Pac. R. Co., 337 Mo. 1160, 88 S. W. 2d 368. "In other words, it is the plaintiff's apparent peril which fixes the limit of the danger zone so far as concerns the defendant's duty to act to avert the impending casualty; and the question of when his peril should have been first apparent must depend upon the facts of the particular case. Elkin v. St. Louis Public Service Co., 335 Mo. 951, 74 S. W. 2d 600. . . . if he is apparently dominated by a fixed intent to pursue his course into the defendant's very path, he is no less in peril at any given time and place after such fixed intent becomes apparent than would be the case if he was aware of his predicament, but was physically unable to extricate himself." Woods v. Kurn et al., Mo. App., 183 S. W. 2d 852.

When the Teague automobile was 360 feet from the crossing, defendant Collier had 4.9 seconds in which to have observed the movement of the Teague car. As we have said, defendant Collier could have seen the Teague automobile as it traveled over a distance of more than 360 feet. For such a distance it progressed *steadily toward the intersection at a speed of fifty miles per hour.* We believe it should

not be held as a matter of law that the movement of the automobile at the unretarded speed of fifty miles per hour was not reasonably indicatory, under the circumstances and surrounding conditions, that the driver was oblivious of the approach of defendants' truck. It would seem that it could have been reasonably found that defendant Collier, in the exercise of the highest degree of care, should have realized that the occupants of the Teague automobile were in peril before the automobile had moved to a point 175 (or 189) feet from the intersection, the distance, according to the evidence, within which the automobile moving at fifty miles per hour could have been stopped. If so, the question of the time at which defendant Collier, in the exercise of the highest degree of care, should have realized the occupants of the automobile were in peril, and the question whether his conduct thereafter was negligent as measured by the humanitarian rule were for the jury. In the case of Lotta v. Kansas City Public Service Co., 342 Mo. 743, 117 S. W. 2d 296, cited and particularly emphasized by defendants, it was held there was no humanitarian negligence in the case. In that case, the truck in which plaintiff's son was riding came into an intersection of a street and private way after the defendant's streetcar, moving along the street, had entered the intersection. Likewise, in our case, the defendants' truck must have entered the intersection prior to the entry of the Teague car. In the Lotta case, however, the driver of the truck saw the approach of the streetcar when his truck was 200 feet from the intersection; neither the driver of the truck nor the motorman of the streetcar was oblivious of the other's approach; the truck was not in a position of imminent peril under the humanitarian rule before the front end was on the pavement of the street, too late ▉▉▉ for the motorman to act; the truck came into a position of peril because of the driver's inability to control the truck due to its defective brakes; and there was nothing in the evidence which should have made it reasonably apparent to the motorman that the driver was unable to control the truck; even the driver did not know the brakes of the truck would not operate normally. And factual situations in other cases cited by defendants so differ from the facts of the instant case that a discussion of them would not be helpful here. We rule that the plaintiff made out a case submissible to the jury.

▉▉ Instruction Number 7 D, the giving of which was specified by the trial court as the ground for sustaining the motion for a new trial, advised the jury,

". . . if you find and believe from the evidence that just prior to the time that the car driven by Alice Teague, struck and collided with the truck being operated by defendant, Carl Collier, that the said Alice Teague was driving said automobile in which deceased was riding westward towards the intersection . . . at a high and excessive rate of speed . . . and that . . . the defendant,

Carl Collier, was operating the truck in a north bound direction on Highway 61 . . . and that the defendant, Carl Collier, believed that the driver of the Teague car would stop said automobile before crossing over and upon said intersection, and that by reason thereof the defendant, Carl Collier, continued to operate the truck along Highway 61 in a north bound direction, and if you further find that at the time the driver of the Teague car drove her automobile in close proximity to said intersection that the driver of the truck, Carl Collier, realized that the Teague car was then not going to stop or slow down for said intersection, and if you further find that at that moment the truck . . . was in such close proximity to said intersection as to produce in the mind of the said Carl Collier great mental stress or excitement because of the conditions that then existed, and that by reason thereof the defendant, Carl Collier, was faced with an emergency calling upon him for decision under such great mental stress or excitement . . . and if you further find . . . that the sudden emergency or danger of collision . . . was not caused or occasioned in any particular by any negligence on the part of the defendant, Carl Collier, as set forth in Plaintiff's instructions, then you are instructed that the defendant, Carl Collier, is not held to the same degree of judgment and care as would be required of him if he was called upon to act under normal conditions and without any influence of great mental stress or excitement.

"You are therefore instructed that if you find the facts as hereinbefore set forth, and find that just immediately prior to said collision imminent danger was apparent to the defendant, Carl Collier, and that at that time, the defendant, Carl Collier, had not been himself negligent in any particular as set forth in plaintiff's instruction, then you are instructed that the defendant, Carl Collier, is only held to that degree of care that a prudent person at said time and place and under the same or similar circumstances would have exercised.

"If therefore, you find from the evidence in this case that the defendant, Carl Collier, was at said time and place operating his said truck with the highest degree of care and had not through any act of negligence on his part, as set forth in plaintiff's instruction, contributed to the sudden emergency that arose, if you find a sudden emergency did arise, but that the same arose by reason of the sole negligence, of the deceased and Alice Teague, if you find that they were negligent, and if you further find and believe from the evidence that when said sudden emergency came into existence, that the defendant, Carl Collier, thereafter acted as any very prudent person would have done under the same or similar circumstances, then you will find the issues for the defendants, Carl Collier, and Plaza Express Company."

It may be here stated that at defendants' request the trial court gave an instruction which was the converse of the plaintiff's in-

struction submitting humanitarian negligence. So the jury were instructed, in substance, that, if when defendant Collier realized or should have realized that the occupants of the Teague automobile had come into imminent danger it was too late for defendant Collier thereafter to avert the collision, plaintiff could not recover. And an instruction was given submitting defendant's theory that the negligence of the driver of the Teague automobile was the sole cause of the collision.

It has been restated, "In determining whether conduct is negligent toward another, the fact that the actor is confronted with a sudden emergency not caused by his own tortious conduct which requires rapid decision is a factor in determining the reasonable character of his choice of action." Vol. II, Restatement of the Law of Torts, sec. 296, p. 796. And see 38 Am. Jur., sec. 41, pp. 686-8; and Lewis v. Zagata, 350 Mo. 446, 166 S. W. 2d 541. In the case at bar no issue of primary negligence of defendants was submitted. The question occurs to us—should the issues of a humanitarian submission be confused by an instruction submitting a "sudden emergency" as a factor which should be taken into account by the jury.

Under the humanitarian rule "the cause of the injured party's peril is immaterial (save, perhaps, when he voluntarily seeks injury . . . )." Grubbs v. Kansas City Public Service Co., 329 Mo. 390, 45 S. W. 2d 71; Freeman v. Berberich, 332 Mo. 831, 60 S. W. 2d 393, and cases therein cited. The humanitarian rule exempts plaintiff from penalty for his own contributory negligence and correspondingly exempts defendant from liability for his antecedent or primary negligence. Zickefoose et ux. v. Thompson, 347 Mo. 579, 148 S. W. 2d 784. In so far as the jury are authorized (in submitting the issues of a humanitarian case) to consider conduct antecedent to the situation invoking the humanitarian rule *in determining whether the defendant thereafter exercised due care,* just so far is the humanitarian rule nullified and its purpose defeated; and responsibility for the injury to the helpless plaintiff (here the death of plaintiff's husband) cast back upon his own contributory negligence, or over upon the negligence of a third person in causing plaintiff's peril. Or, although defendant may have acted in all respects in harmony with due care after the humanitarian situation arose, the responsibility for the casualty may be charged back to his own antecedent primary negligence.

The submission of the circumstance of sudden emergency as a factor in determining the reasonable character of a defendant's choice of action necessitates the hypothesizing of conduct of defendant prior to his coming into the position where the hypothesized emergency arose, in order that it may be found that the sudden emergency was *not caused* by his own tortious conduct. Lewis v. Zagata, supra. A wide field of inquiry has been opened, necessarily anteced-

ent to the emergency; so wide as to include the examination of conduct of defendant, of plaintiff and of third persons and the causal connection of such conduct with the emergency hypothesized. Was the sudden emergency caused by the tortious conduct of the defendant; or was it due to the conduct of plaintiff or of a third person, or did it arise through the action of some physical force? The field of inquiry in determining whether defendant's conduct was tortious and whether such conduct caused the emergency circumstance is so wide as to admit the examination of conduct antecedent to the plaintiff's imminent peril, regardless of whether the hypothesized emergency occurred at or after the time the plaintiff came into danger. In this manner issues of negligence, antecedent to the humanitarian situation, and causal connection thereof to the emergency are submitted to the jury for their consideration in determining whether the circumstance of emergency should be a factor in determining the reasonable character of defendant's choice of action, as his conduct is measured by the humanitarian rule. It is true the causal connection is hypothesized as between the defendant's negligence and the emergency circumstance. Nevertheless, we do not doubt that the jury are thus authorized to consider the evidence supporting or refuting the "sudden emergency" submission in determining the ultimate question of defendant's liability. The suddenness with which the plaintiff comes into danger may in itself constitute an emergency (the plaintiff being helpless and in danger) requiring, in the exercise of due care, prompt action with the means at hand and at a time when action is effective; and the situation may be nonetheless fraught with danger to defendant. And other emergency circumstances may attend the humanitarian situation. Although we have not found a discussion of this very subject, we venture the opinion—whatever emergency circumstance, existent in a situation to which the humanitarian rule is applicable, is governed by the rule itself. In this respect the *emergency* is implicit in the humanitarian situation which confronts defendant, and should not be isolated and commented upon by instruction whereby problems of causation thereof, and the antecedent negligence of defendant (or the contributory negligence of plaintiff), the penalty for which he has been exempted, may be considered by the jury upon the ultimate issue.

We are not intending to say that any fact or circumstance obtaining at the time and after the humanitarian rule seizes upon the situation cannot be urged by counsel and considered by the jury in determining whether a defendant exercised due care in averting a casualty.

Instruction Number 7 D strikingly illustrates, we believe, the prejudicial effect of attempting to ingraft a theory of "sudden emergency" in the submission of a humanitarian negligence case. Studying the instruction it is noted that it requires a negative finding of "negligence on the part of the defendant, Carl Collier, as set

forth in Plaintiff's instructions'' in causing or occasioning ''the sudden emergency or danger.'' The only negligence ''set forth in Plaintiff's instructions'' was humanitarian negligence. Now it appears, in order for the defendant to be blameless in causing the emergency, a negative finding of primary negligence in causing or occasioning ''the sudden emergency or. danger'' should also be required. If the jury were so instructed, primary negligence of defendant would be directly put in issue in the trial of the humanitarian cause. The instruction further hypothesizes the negligence of the driver of the Teague automobile (Alice Teague) in driving the automobile ''at a high and excessive rate of speed.'' Here it is clearly seen that the negligence of a third person, Alice Teague, in driving the automobile ''at a high and excesseive rate of speed'' (bringing the plaintiff's husband into danger, under the facts of our case) is hypothesized as the cause of the hypothesized emergency position of defendant, and the jury is authorized to find for defendants if, in view of the emergency hypothesized, defendant Collier was thereafter free of humanitarian negligence. Of course the jury understood they were authorized to find the hypothesized negligence of Alice Teague to be decisive, even though they may not have believed her negligence to have been the sole cause of the collision. We hold the giving of Instruction Number 7 D was prejudicially erroneous.

Assigned errors in other instructions are urged by respondent as further grounds upon which a new trial should have been granted. We will not review these questions. . Counsel have had the benefit of a study of the briefs and, to the end of aiding a trial court in submitting the issues fairly in all respects should the cause be tried again, may obviate these questions.

The order granting a new trial should be affirmed.

It is so ordered. *Bradley* and *Dalton, CC.,* concur.

PER CURIAM:—The foregoing opinion by VAN OSDOL, C., is adopted as the opinion of the court. All the judges concur.