JOHN FRANDEKA, Respondent, v. ST. LOUIS PUBLIC SERVICE COMPANY, a Corporation, Appellant, No. 41612—234 S. W. (2d) 540.

Division One, November 13, 1950.

Motion for Modification of Opinion, Rehearing or to Transfer to Banc, Overruled, December 11, 1950.

*Mattingly, Boas & Richards* and *Lloyd E. Boas* for appellant.

*Everett Hullverson* and *Carmen Speiser* for respondent; *Orville Richardson* of counsel.

[542] HYDE, J.—Action for damages for personal injuries sustained in a collision between defendant's bus and an automobile driven by plaintiff. Verdict was for plaintiff for $82,000.00. The trial court ordered a remittitur of $30,000.00 and final judgment was entered for plaintiff for $52,000.00, from which defendant appeals.

Defendant contends that its motion for a directed verdict should have been sustained. This involves two questions: (1) whether plaintiff was guilty of contributory negligence as a matter of law; and (2) whether plaintiff made a jury case on humanitarian negligence. The trial court decided that a humanitarian case was not made and refused to submit instructions authorizing a verdict on that theory. The case was submitted on primary negligence of the bus driver in failing to hear the siren of the automobile driven by plaintiff and to see its approach in time to stop the bus, slacken its speed or turn it aside. An opinion has been written herein by Commissioner Aschemeyer, which we adopt in substance as Part I hereof for our statement of facts (stating facts most favorable to plaintiff) and our ruling on the question of contributory negligence as a matter of law, as follows:

I—Contributory Negligence.

Some of the facts are not in dispute. The accident occurred on Sunday morning, October 19, 1947, between 11:00 and 11:30. Twelfth Street runs north and south, is 110 feet wide and has two sets of streetcar tracks running down its approximate center. It is 15 feet from the east rail of the northbound tracks to the west rail of the southbound tracks. Market Street runs east and west, is 76 feet wide and intersects Twelfth Street at right angles. It is 270 feet from the south curb of Market Street to the north curb of Walnut Street (one block south); Walnut Street is 36 feet wide so that it is 306 feet from the south curb of Walnut Street to the south curb of Market Street. Traffic at the intersection of Twelfth and Market Streets is

controlled by electric traffic signals, a left turn being permitted upon a white arrow. Buses of defendant's Lindenwood line operate westwardly on Market Street and cross Twelfth Street when the traffic lights are green for east and west traffic. There [543] are three traffic lanes on the north side of Market Street. The lane nearest the middle of Market Street is for traffic approaching Twelfth Street from the east and intending to make a left turn to proceed southwardly on Twelfth Street. Buses of defendant's Gravois line use this left-turn lane and, upon the appropriate signal, turn left to go south on Twelfth Street. At the time of the accident, traffic was light at and near the intersection. The streets were dry and it was a clear, bright day.

Plaintiff's evidence was as follows: He was a member of the fire department of St. Louis, assigned to Engine House No. 2 near Twelfth and Clark Streets, which was under the command of Battalion Chief Johnson. He was a fire-fighter and a substitute driver of the Chief's car. On the morning of the accident, the regular driver of this car had been scalded in an accident at the Engine House and plaintiff drove the injured man and the Chief to the City Hospital. He waited outside the hospital while the Chief took the injured man in. The car, a red 1947 Ford, was equipped with a siren and a police radio. After the Chief left the hospital and as he was getting in the car, an alarm came over the radio approximately as follows: "an alarm sounding at 1005 Olive Street." This was in their district. Plaintiff said to the Chief: "Isn't that us?" and he replied: "yes, let's go." Plaintiff was operating the car under orders of the Battalion Chief.

As soon as they got away from the hospital, plaintiff turned on the siren and it was blowing continuously up to the time of the accident. They drove east to Twelfth Street and then north, going from 50 to 55 miles per hour. He drove in the middle of the street, between the two sets of streetcar tracks, because it is easier to see both sides of the street and to turn either way in case of trouble. When he was about one-half block south of Market Street, he noticed all traffic was stopped. There was a clear field and he kept going. When he was about 20 feet south of Market Street, a bus "zoomed" up in front of him. He did not know where it came from. He applied his brakes and tried to swerve but the bus blocked his way and he could not avoid hitting it. Plaintiff sustained serious and permanent injuries and Battalion Chief Johnson was killed.

On cross-examination plaintiff stated: Battalion Chief Johnson did not tell him how to drive the car. He was driving 50 to 55 miles per hour and kept traveling at the same rate. He did not look at the traffic lights at Twelfth and Market and did not know whether they were red or green. He did not see the bus until it was in front of him and until it was in the streetcar tracks. He had no idea how fast

the bus was going. From Walnut Street (one block south) he could see the whole intersection of Twelfth and Market Streets. He was 20 feet south of the south curb of Market Street when he first saw the bus and from this point he could see north to Olive Street (a distance of three blocks.) When he was a block south of Market Street, he looked and the intersection was clear. As he approached the intersection he kept watching but did not see the bus until its front was across the streetcar tracks and directly in front of him. The bus was going west.

He knew of no reason why he had not seen the bus during the time it traveled from the east curb of Twelfth Street to the middle of that street (a distance of 55 feet). Nothing obstructed his view and he knew no reason why he did not see the bus sooner. The bus was on the north side of Market Street and 70 to 80 feet north of him when he first saw it. Going at 50 to 55 miles per hour he could have stopped his car in 140 to 160 feet. He could have reduced his speed from 55 to 30 miles per hour in about 75 feet and could have made a right turn, east on Market Street, at 30 miles per hour. Plaintiff stated that he was operating at a speed consistent with safety and that he had his car under control.

Other witnesses for plaintiff stated that his car came north in the center of Twelfth Street going at the speed of 50 to 55 miles per hour; that it did not slow down until the brakes were applied when it was 20 [544] feet to 24 feet south of the south curb of Market Street; that the siren was sounded continuously (one witness who was walking on the east side of Twelfth Street just north of Market Street heard the siren and saw plaintiff's car when it was about 1¼ blocks south of him) ; that a Gravois bus was stopped in the left-turn lane of Market Street east of Twelfth Street; that the Lindenwood bus involved in the accident was going west on Market Street, its right side being about 5 feet south of the north curb of Market Street; that the traffic light turned green as the bus approached Twelfth Street from the east and that it proceeded across Twelfth Street without stopping, passing the stopped Gravois bus to the north; that there was no other moving traffic; that its speed, being variously estimated, was 5½, 8, 10, 12 to 15, or 15 to 20 miles per hour; that the bus proceeded across Twelfth Street in a straight line and at a uniform speed (one witness, a passenger on the bus, stated he heard the siren as the bus entered the intersection and that the bus driver seemed to take his foot off the accelerator and then immediately accelerated again); that the front of the bus had reached the center of Twelfth Street when plaintiff applied his brakes; that plaintiff's car swerved to the left and struck the center portion of the bus when the bus was straddling the streetcar tracks; that the bus continued west and did not stop until it was some distance west of Twelfth Street; and that plaintiff's car was facing

south in the southbound streetcar tracks, in a badly damaged condition, after the impact.

Plaintiff offered in evidence an ordinance of the City of St. Louis which provided that emergency vehicles, while on emergency service, and while sounding their sirens continuously had the right of way over other vehicles which were required to pull as closely as possible to the right-hand curb and stop, and which also provided that such emergency vehicles were not required to observe stop signs or electric traffic signals.

A number of passengers on the bus testified for defendant. None of them heard the siren or saw the fire car until just before the collision. As the bus approached Twelfth Street it proceeded into the intersection without stopping. Some of the witnesses noticed the traffic lights and stated they were green for westbound traffic. Some noticed the Gravois bus stopped in the left-turn lane, while others did not. The bus was in the center of Twelfth Street when it was hit. Plaintiff's car hit the center of the left side of the bus which was about 32½ feet long and 8 feet wide. (Pictures in evidence show the damage to the bus near the emergency rear door which was bent.) The impact knocked some passengers from their seats and a number of passengers were injured. The bus continued west after the accident and stopped 30 to 40 feet west of the west curb of Twelfth Street.

The bus driver stated: The traffic light was green as he approached Twelfth Street. He was in the first lane from the north curb and 6 or 8 feet south of that curb. As he approached Twelfth Street, he had been slowing down but when the light changed to green he proceeded across. He did not see plaintiff's car until just an instant before the collision. At that time the front end of the bus was about 5 feet west of the west rail of the northbound track. The Gravois bus was stopped in the left-turn lane as he passed it and entered the intersection. He did not hear the siren. He glanced to the left and saw nothing. He went across the intersection at a uniform speed (approximately 15 miles per hour) and could have stopped the bus in 23 to 25 feet. He did not sound his horn or swerve and did not see plaintiff's car until just before the collision. At the time of impact the front of the bus was west of the southbound streetcar tracks.

The briefs of both parties discuss at some length the interpretation, application, and effect of certain rules of the fire department of the City of St. Louis concerning the duties of personnel in responding to alarms and in operating apparatus. In view of the conclusion we have reached upon the question of plaintiff's contributory negligence, we deem it unnecessary to discuss [545] these rules since our decision has been reached without reference to them. The evidence is sufficient to warrant the finding that plaintiff was prop-

erly responding to the radio alarm and was on an emergency run at the time the accident occurred. Accordingly, we recognize that under the ordinance of the City of St. Louis, plaintiff had the right of way over defendant's bus (which should have stopped and yielded the right of way to him) and was not required to observe the electric traffic signals at the intersection where the accident occurred.

Was plaintiff guilty of contributory negligence as a matter of law? Plaintiff was under a duty to exercise such care as an ordinarily prudent person would exercise under similar circumstances, including in the circumstances involved the fact that plaintiff was operating an emergency vehicle upon an emergency run. He had the right of way and was under a duty to answer the alarm with promptness. Olsen v. Citizens' R. Co., 152 Mo. 426, 54 S. W. 470, 471; Michael v. Kansas City Western R. Co., 161 Mo. App. 53, 143 S. W. 67, 69; Green v. United Rys. Co. of St. Louis, 165 Mo. App. 14, 145 S. W. 861, 863. He was not required to anticipate that the drivers of other vehicles would fail to yield the right of way to him. On the other hand he had no right, in the exercise of due care for his own safety, to assume that the driver of defendant's bus would yield the right of way to him when the obvious circumstances indicated that the bus driver did not intend to do so. Green v. United Rys. Co. of St. Louis, supra.

As plaintiff approached the intersection of Twelfth and Market Streets, he was under a duty to maintain a lookout ahead and laterally ahead. Wright v. Osborn, 356 Mo. 382, 201 S. W. (2d) 935, 938; Weis v. Melvin, (Mo. Sup.) 219 S. W. (2d) 310, 311. Even though he was driving an emergency vehicle he had no right to approach the intersection at a high rate of speed in utter disregard of the bus which was already in the intersection. Hoffman v. People's Motorbus Co. of St. Louis, (Mo. App.) 288 S. W. 948.

Plaintiff's testimony is that he approached the intersection at a speed of 50 to 55 miles per hour and did not apply his brakes until he was 20 feet south of the south curb of Market Street on 70 to 80 feet south of the bus which was directly in front of him and had reached the middle of Twelfth Street. At that point the front of the bus had driven about 55 feet from the east curb of Twelfth Street. While there is some mention in the evidence of automobiles parked along the east side of Twelfth Street, south of Market Street, plaintiff testified in this connection as follows: "Q. Well, did they obstruct your view? A. No, they didn't. Q. They didn't. Then you had a clear view of the intersection, didn't you? A. Yes, sir."

Plaintiff said he had a clear view of the intersection from Walnut Street (270 feet south of the south curb of Market Street). He saw nothing and while he continued to watch the intersection, he saw nothing until he was within 20 feet of Market Street. If we assume the bus was traveling 20 miles per hour (the maximum speed shown

by the evidence), plaintiff was approximately 160 feet south of the south curb of Market Street or approximately 220 feet south of the path of the bus when it entered the intersection. When the front of the bus had reached a point midway between the center of Twelfth Street and the east curb, plaintiff was more than 100 feet south of the south curb of Market Street and at least 160 feet south of the path of the bus. He stated he could have stopped his car in 140 to 160 feet at the speed he was traveling and could have slowed down to 30 miles per hour in about 75 feet. He stated also that at 30 miles per hour he could have turned east on Market Street and thus avoid a collision.

It is apparent from plaintiff's own testimony that had he been exercising ordinary care to keep a lookout, he could have [546] seen the bus proceeding across Twelfth Street directly into his path, in disregard of his right of way, when he had ample distance to reduce the speed of his car, bring it under control, and thus avoid colliding with defendant's bus. Under the circumstances, plaintiff had no right to assume that his right of way would be observed, when the evident facts indicated that the bus was proceeding across the street in disregard of plaintiff's right of way.

But plaintiff said he looked but did not see. He knew of no reason why he did not see the bus sooner. "Where one is charged with the duty to look and to look is to see, he must be held to have seen what looking would have revealed." Smith v. Kansas City Public Service Co., 328 Mo. 979, 43 S. W. (2d) 548, 553; Weis v. Melvin, (Mo. Sup.) 219 S. W. (2d) 310, 311. "The law is further well settled that 'a failure on the part of a plaintiff, where a duty to look exists, to see what is plainly visible when he looks, constitutes contributory negligence as a matter of law.'" State ex rel. Kansas City Southern R. Co. v. Shain, 340 Mo. 1195, 105 S. W. (2d) 915, 918; Dempsey v. Horton, 337 Mo. 379, 84 S. W. (2d) 621, 625, 626.

Plaintiff has cited some twelve cases[1] involving emergency vehicles engaged upon emergency runs which, he argues, require the conclusion that the question of plaintiff's contributory negligence was for the jury. We have examined all of them carefully and have concluded that they do not apply under the facts of the instant case.

---

[1]Smith v. Union Ry. Co., 61 Mo. 588; Olsen v. Citizens' R. Co., 152 Mo. 426, 54 S. W. 470, 471; O'Neill v. St. Louis Transit Co., 108 Mo. A. 453, 83 S. W. 990, 991; Michael v. K. C. Western Ry. Co., 161 Mo. A. 53, 143 S. W. 67, 68-69; Burleigh v. St. Louis Transit Co., 124 Mo. A. 724, 102 S. W. 621, 623; Green v. United Rys. Co. of St. Louis, 165 Mo. App. 14, 145 S. W. 861, 863-4; Duffy v. K. C. Rys. Co., Mo. A., 217 S. W. 883, 885; Malone v. K. C. Rys. Co., Mo. A., 232 S. W. 782, 784; Swinehart v. Kansas City Rys. Co., Mo. App., 233 S. W. 59, 62-63; O'Sullivan v. Kansas City Rys. Co., Mo. App., 237 S. W. 843, 845; Hogan v. Fleming, 218 Mo. A. 172, 265 S. W. 875, 877; Raymore v. Kansas City Public Service Co., Mo. App., 141 S. W. (2d) 103, 106, 108, 111.

One of them[2] was a suit by a passenger on a streetcar who was injured when the streetcar collided with a fire department vehicle. There was no issue of contributory negligence. In several cases[3] plaintiff was not the driver of the emergency vehicle and the negligence of the driver was not imputable to him. In none of these cases were the facts similar to those in the instant case, where plaintiff approached the intersection at a high rate of speed in disregard of a vehicle, plainly visible, which had already pre-empted the intersection.

Plaintiff suggests that he was not guilty of contributory negligence because the Battalion Chief was in charge of the automobile and plaintiff was subject to his directions. Plaintiff testified that the Chief did not tell him how to drive, and in any event, plaintiff could not rely upon the Chief to keep a lookout when that duty was upon him as driver of the car. Plaintiff also suggests that his statements, elicited upon cross-examination, that he had the car under control, was keeping a lookout, and was operating at a speed consistent with safety had probative value and made the issue of his contributory negligence a jury question. But these conclusions cannot be assigned probative value when the facts to which plaintiff testified indicate clearly that they are without basis.

If plaintiff had actually seen the bus enter and proceed across the intersection without taking any steps to reduce the speed of his automobile and bring it under such control that a collision could have been avoided, when he clearly had the time and the space to do so, reasonable minds could not differ in the view that plaintiff was guilty of negligence which contributed to the accident. On his own testimony, plaintiff had a clear view of the [547] entire intersection when he was at least 270 feet south of the south curb of Market Street. He either did not look, or having looked, failed to see what was plainly visible to him. Under these circumstances we hold that plaintiff was guilty of contributory negligence as a matter of law. Smith v. Kansas City Public Service Co., supra; Weis v. Melvin, supra; State ex rel. Kansas City Southern R. Co., supra. (See also White v. Teague, 353 Mo. 247, 182 S. W. (2d) 288, 289, where we held that the driver of an automobile was guilty of negligence as a matter of law in approaching an intersecting highway at 50 miles per hour without checking speed, without observing warning or stop signs, and without observing the approach of a truck until the moment of collision.)

The contributory negligence of plaintiff was, of course, a complete defense to the charges of primary negligence against defendant. State ex rel. Kansas City Southern R. Co. v. Shain, 340 Mo. 1195,

---

[2]Olsen v. Citizens' R. Co., supra.
[3]Burleigh v. St. Louis Transit Co., supra; Malone v. Kansas City Ry. Co., supra; Swinehart v. Kansas City Ry. Co., supra; Hogan v. Fleming, supra.

105 S. W. (2d) 915, 918; Farris v. Thompson (Mo. App.), 168 S. W. (2d) 439, 444. The case was, therefore, erroneously submitted to the jury upon defendant's primary negligence.

II - Humanitarian Negligence.

However, it is contended that plaintiff made a jury case of humanitarian negligence. This, of course, depends upon whether defendant's driver had the ability to avoid a collision by the exercise of the highest degree of care (with safety to himself and his passengers) after plaintiff came into a position of imminent peril. (Banks v. Morris & Co., 302 Mo. 254, 257 S. W. 482; State ex rel. Fleming v. Bland, 322 Mo. 565, 15 S. W. (2d) 798.) The decisive questions here are when did plaintiff come into a position of imminent peril and what could the bus driver have done thereafter. The zone of imminent peril is always widened considerably beyond the immediate path of a moving vehicle by the obliviousness of a person approaching its path. (Crews v. Kansas City Public Service Co., 341 Mo. 1090, 111 S. W. (2d) 54.) This zone commences and the duty of a driver of a moving motor vehicle begins when he saw, or could have seen by the exercise of the highest degree of care, that the person approaching the path of his vehicle was oblivious to the danger and was intent on continuing across his path. (Homan v. Missouri Pacific R. Co., 334 Mo. 61, 64 S. W. (2d) 617.) It is his duty to act on reasonable appearances of obliviousness and at a time when action would be effective. (Womack v. Missouri Pacific R. Co., 337 Mo. 1160, 88 S. W. (2d) 368.) However, the zone of imminent peril is much narrower when the approaching person is not oblivious or shows no reasonable appearances of obliviousness. Under such circumstances "the duty of such operator to act does not commence until such person is actually in its path or so close to it that it is apparent (at the rate of speed and manner he is moving) that he will not stop before reaching it." (Smithers v. Barker, 341 Mo. 1017, 111 S. W. (2d) 47.) "In the absence of obliviousness, the position or danger zone of imminent peril of a person approaching the path of a moving vehicle reaches no farther beyond the direct path of such moving vehicle than the distance within which such approaching person is unable by his own efforts to stop short of it." (Lotta v. Kansas City Public Service Co., 342 Mo. 743, 117 S. W. (2d) 296; see also Yeaman v. Storms (Mo. Sup.—Banc), 217 S. W. (2d) 495.) Thus the greater the speed of the approaching vehicle the wider the zone of imminent peril; and obliviousness and reasonable appearances of obliviousness widens it still farther.

In this case we do not think that plaintiff's conduct showed reasonable appearances of obliviousness at the time the bus entered the intersection. According to plaintiff's own testimony he was looking directly toward the bus and continuously operating his siren. That would indicate an intention to come on through the intersection

but not obliviousness. Therefore, the bus was not only in the intersection first but it was there before plaintiff was in a position of imminent peril. (See Lotta v. Kansas City Public Service Co., supra, 117 S. W. (2d) l. c. 302.) The situation here is different from that in the Teague cases where the collision occurred [548] at night and all that could be seen was lights on the approaching car which came across a main highway (which the driver did not know was there) at undiminished high speed. (White v. Teague, 353 Mo. 247, 182 S. W. (2d) 288; Teague v. Plaza Express Co., 354 Mo. 582, 190 S. W. (2d) 254; Teague v. Plaza Express Co., 356 Mo. 1186, 205 S. W. (2d) 563.) As hereinabove stated, plaintiff's car was about 160 feet (more than half a block) south of the south curb of Market Street or approximately 220 feet south of the path of the bus (farther if the bus was going less than 20 miles per hour) when the bus entered the intersection. Certainly, for the reasons above mentioned, plaintiff did not show reasonable appearances of obliviousness at that time and he still had ability to stop, so he was not then in a position of imminent peril. Moreover, it would seem at that point, the bus driver might not be able to look that far laterally without failing to keep a proper lookout forward.

Furthermore, when the front of the bus was midway between the east curb of the intersection and the center of Twelfth Street, plaintiff was at least 100 feet south of the south curb of Market Street and about 160 feet south of its path. It was then probably too late for plaintiff's car to have been stopped short of its path but plaintiff could have slowed it to 30 miles per hour in 75 feet and turned away from the bus. The bus could have been stopped in 23 to 25 feet, according to the driver's testimony, but this was based on a speed of 15 miles per hour. (The evidence of neither plaintiff nor the bus driver shows that reaction time was considered in their estimates so, no doubt, something should be added to both estimates to get actual stopping distances.) Somewhere near that point, it must have become apparent that plaintiff intended to continue across the intersection and would not stop short of the path of the bus. At that point the front of the bus was not more than one second ($27\frac{1}{2}$ feet) from the center of the street, where plaintiff first saw it, and it could not thereafter have been stopped short of the path of plaintiff's car. It required at least two seconds thereafter for plaintiff's car to reach the point of collision, which makes it seem likely that the bus was going as fast as 20 miles per hour, because all the evidence was that the collision occurred while the bus was on the southbound streetcar tracks and that plaintiff's car remained on these tracks after the collision. ($27\frac{1}{2}$ feet, to the center of the street, plus $32\frac{1}{2}$ feet, the length of the bus, is 60 feet, which was about the distance the bus must have moved, after plaintiff's car reached the point two seconds from the place of collision, and this indicates a speed of 20 miles

per hour.) Since plaintiff's car struck the middle of the bus, we think plaintiff's evidence fails to show that the bus driver could have thereafter stopped the bus in time to prevent a collision. For the same reason it is wholly conjectural whether or not a reduction in the speed of the bus could have been effective to avoid the collision. This is not an almost escaping case. (See Gann v. Chicago, R. I. & P. R. Co., 319 Mo. 214, 6 S. W. (2d) 39; State ex rel. Weddle v. Trimble, 331 Mo. 1, 52 S. W. (2d) 864; Tharp v. Thompson, Mo. App. 139 S. W. (2d) 1116; and Smith v. Thompson, 346 Mo. 502, 142 S. W. (2d) 70.) Certainly, it would have accomplished nothing for the bus driver to have sounded a warning which could not have been heard above the noise of the siren on plaintiff's car.

■ The bus driver said he did not see plaintiff's car until the instant before the collision but that is immaterial on the issue of humanitarian negligence. In the exercise of the highest degree of care, on public streets, the bus driver was under a duty to keep a lookout. Where such a duty exists, the humanitarian rule is predicated upon discoverable, as well as discovered, peril. (Krause v. Pitcairn, 350 Mo. 339, 167 S. W. (2d) 74, 76; Womack v. Missouri Pacific R. Co., 337 Mo. 1160, 88 S. W. (2d) 368; Mayfield v. Kansas City Southern R. Co., 337 Mo. 79, 85 S. W. (2d) 116, 123; Marczuk v. St. Louis Public Service Co., 355 Mo. 536, 196 S. W. (2d) 1000, 1002.) "A failure to keep a lookout, at a place where there is a duty to do so, is not, under our Missouri humanitarian rule, any excuse there was a duty to keep a lookout, the question is could he have been discovered in time to prevent [549] his injury if such a lookout had been kept. In other words, in spite of a failure to keep a lookout, the humanitarian doctrine may come into operation, not because that is in itself humanitarian negligence, but because we have, at places where there is a duty to keep a lookout, extended the humanitarian rule to discoverable as well as discovered peril. * * * If there was a duty to keep a lookout, the question is could he have been seen in time if it had been kept, and not was a lookout kept." (Mayfield v. Kansas City Southern Ry. Co., supra, 85 S. W. (2d) l. c. 123, 124.) Therefore, under plaintiff's evidence, it does seem reasonable to believe that the bus driver, if he had made timely discovery of plaintiff's imminent peril, could have thereafter swerved or turned the bus away from the path of plaintiff's car in time to avoid a collision.

No doubt, some slackening of speed would have been required to swerve or turn the bus away, with safety to the passengers on the bus, if it was going 20 miles per hour, and perhaps also at 15 miles per hour. Nevertheless, the bus driver did have at least two seconds from the time it would have reasonably appeared that plaintiff intended to come on through the intersection and could not have stopped short of the path of the bus. We have held plaintiff guilty

of contributory negligence as a matter of law in not seeing the bus during the two seconds when the bus was entering the intersection and reaching the center of Twelfth Street; and we also believe that the jury could reasonably find the bus driver was guilty of humanitarian negligence in failing to slacken speed *and* swerve during a like period of two seconds time prior to the collision, after the bus reached a point midway between the east curb of Twelfth Street and the center of the street. It is true the bus was almost 33 feet long and less maneuverable than an automobile. (It is also true that there was evidence of lower speed than 20 miles per hour.) While there was no evidence to show at what speed a bus could be safely swerved or turned, we think it might be reasonably found from general knowledge of motor vehicles that its speed could have been slackened sufficiently, in two seconds, to have made a safe turn in time to have avoided the collision after plaintiff's intention to proceed became apparent; or that at least plaintiff should have the opportunity to produce evidence on this issue. (See Hollister v. A. S. Aloe Co., 348 Mo. 1055, 156 S. W. (2d) 606; Brown v. Callicotte (Mo. Sup.) 73 S. W. (2d) 190.) We, therefore, hold that the case could properly be submitted to the jury on humanitarian negligence of failure to slacken speed *and* swerve (not slacken *or* swerve) if the speed was 20 miles per hour; or failure to swerve or turn the bus if the speed was found to be lower.

The judgment is reversed and cause remanded.

*Dalton, J.,* and *Conkling, P. J.,* concur; *Hollingsworth, J.,* not sitting, because not a member of court when cause was submitted.