**Charles NELSON (Plaintiff), Respondent,**

**v.**

**Vincent M. O'LEARY (Defendant), Appellant.**

**No. 45081.**

Supreme Court of Missouri.

Division No. 1.

June 11, 1956.

John F. Evans, Evans & Dixon, St. Louis, for appellant.

Cleo V. Barnhart, St. Louis, for respondent.

VAN OSDOL, Commissioner.

In this action for personal injuries plaintiff had verdict and judgment for $10,000, and defendant has appealed.

Plaintiff, a pedestrian, was injured when he was struck by defendant's automobile near the intersection of Broadway and Keber Streets in St. Louis. Plaintiff's case was submitted to the jury by plaintiff's principal verdict-directing Instruction No. II, on negligence under the humanitarian rule.

Herein, defendant-appellant contends the trial court erred in overruling his motion for a directed verdict. It is argued the evidence was wholly insufficient to establish beyond speculation and conjecture that defendant in the exercise of the highest degree of care could have discovered plaintiff in a position of imminent peril in time thereafter to have avoided a collision. It is said that when plaintiff's peril was discoverable, the speed of defendant's automobile and the intervening distance left the barest possibility that a collision could have been avoided. Defendant-appellant further contends that the trial court erred in giving plaintiff's Instruction No. II, which submitted that defendant could have avoided a collision "by either swerving his automobile to the right, or by slackening the speed of his said automobile and swerving said automobile to the right"; that the trial court erred in refusing defendant's Instruction D which would have withdrawn the issue of humanitarian negligence in failing to slacken speed; and that the trial court erred in giving plaintiff's Instruction No. V advising the jury that, if defendant's negligence directly contributed to the casualty, the fact that plaintiff's own conduct contributed to his injury was no defense. There are further contentions of error of the trial court in ruling on objections to the argument of counsel.

Approaching and passing the intersection of Broadway and Keber in St. Louis, the paved portion of Broadway, a north-south street, is forty-five feet wide. There is a white line in the center of the pavement. Keber, an east-west street, approaches and intersects Broadway at an angle from the eastward. Keber does not extend west of Broadway. There is a vacant lot southeast of the intersection. The building occupied by the St. Louis Screw & Bolt Company is located at the northeast corner of the intersection. The right of way of the St. Louis Public Service Company's streetcar line is immediately west of and parallel with the west line of Broadway, and to the west of the right of way of the streetcar line is Bellefontaine Cemetery.

There are street lights on the east side of Broadway at the intersection—one light on either side of Keber. There are also street lights at intervals of one hundred feet along the east side of Broadway. A covered manhole is located in Broadway six and one-half feet north of the northernmost curved portion of the curved curb at the northeast corner of the intersection. The manhole is fourteen and one-half feet west of the east curb—eight feet east of the center line of Broadway.

There was evidence introduced tending to show that plaintiff had been drinking since about three o'clock in the afternoon of April 9, 1954. At seven o'clock in the evening of that day he was in the vicinity of Delmar and Euclid, several miles from the intersection of Broadway and Keber where he was injured. He cannot explain his presence at Broadway and Keber, nor can he state the circumstances of his injury.

At approximately ten-thirty o'clock in the evening of April 9th, nightwatchmen on duty at the St. Louis Screw & Bolt Company's building came out of the basement at the rear of that building and proceeded westwardly along the north side of Keber. When they were about forty feet from the intersection, one of the watchmen observed a man "kinda 'hooped' over." The man (plaintiff) was standing still on the manhole in Broadway. He was looking toward the cemetery—"he never moved at all. I even hollered at him, tried to get him to come out of the street." The other watchman said he saw plaintiff staggering northwardly near the east curb. "He was bent over like he was looking down for something." One of the watchmen started out into the street, but he was warned by the other watchman to stay on the sidewalk. Meanwhile, plaintiff had moved "about out in the middle" of Broadway at a time when three (or more) northbound automobiles were approaching. Plaintiff was "in between both flows of traffic, * * there was a car or two that had swerved over, and then I lost sight of him, * * *. Then a car came along right shortly in back of that, and he was struck."

At least three northbound automobiles had approached the intersection. The first was driven by one Bierman. (There was some evidence that another vehicle had preceded the Bierman car.) The Bierman automobile was moving in the "outside lane, towards the curb." The Bierman vehicle was followed by defendant, who was driving "a little bit farther to the left." The left side of defendant's automobile was aligned about one-half car width to the left of the alignment of the west (left) side of the Bierman car. The left side of defendant's car was "in the neighborhood of four feet" from the white line, and was about four feet from the white line when defendant stopped his automobile after it had collided with plaintiff. Defendant's automobile was followed in turn by the automobile driven by one White. All three of these vehicles were moving twenty to twenty-five miles per hour. Defendant's and White's cars were following the vehicles respectively preceding them at a distance of one and one half to two car lengths.

Bierman, in approaching the intersection, had been watching a pedestrian (other than plaintiff) walk from the center of the street toward the northeast corner of the intersection. Bierman testified that he did not see plaintiff until the Bierman automobile was four or five (or six) feet from plaintiff. Bierman swerved his car sharply to the right and passed plaintiff at a distance of about a foot and a half. White, whose automobile, as stated, had been following the defendant's car, saw plaintiff thrown with his body on a horizontal plane onto and along the side of defendant's car. Plaintiff fell on the pavement behind defendant's vehicle.

Defendant testified that he noticed the Bierman car swerving to the right, and "just as I looked, there was a man hunched down, kinda running (eastwardly) towards the headlight." Defendant also testified that the man (plaintiff) was six or seven feet from the front of defendant's car when defendant first discovered him. "He was coming from the white line." The left headlight of defendant's car struck plaintiff. "He came in between the headlight and the middle of the machine." On cross-examination defendant said he did not think he could have swerved to the right because the Bierman car was swerving in that direction, and because of a truck which defendant thought was moving northwardly about one hundred feet to his right rear. But, finally, defendant said, "To tell you the truth, I didn't see the man in time to swerve."

Defendant-appellant argues that the evidence which we have set out supra, considered from a standpoint most favorable to plaintiff, did not justify the submission of humanitarian negligence of defendant in failing to swerve, or to slacken speed and swerve. It is said that when plaintiff was first seen by Bierman, plaintiff was but a few feet, approximately six feet, in front of the Bierman car; that plaintiff was stooped over so that the upper part of his body could not have been visible above the Bierman car which swerved around plaintiff at a distance of only eighteen inches; that, obviously, plaintiff could not have been discovered by defendant until the Bierman car, about seventeen feet in length and swerving at an angle to the right, had moved the distance equal to its length, plus six feet, in passing plaintiff; and that, during the stated movement of the Bierman car, defendant had likewise traveled the distance of twenty-three feet, so that defendant, when he first could have seen plaintiff was but one and a half car lengths, twenty-five and a half feet, away.

From these and other premises, taking into account the testimony as to probable minimum and maximum speed (twenty to twenty-five miles per hour) and distances (one and a half to two car lengths), defendant-appellant undertakes to demonstrate mathematically that, allowing three quarters of a second for reaction time, defendant could not have acted in an endeavor to avert the casualty until he was but three to six feet or from one tenth to one third of a second away from the point of collision. However, we shall not here

set out our analyses of these arguments because we believe defendant-appellant has failed to notice substantial evidence tending to show that defendant, had he been looking, could have discovered plaintiff was in imminent peril at the time defendant came to the point where he had a view of the area illuminated by the street lights at the intersection. Defendant-appellant has cited cases wherein oblivious plaintiffs have come suddenly into imminent peril, or wherein plaintiffs were not oblivious and, consequently, the zones of imminent peril were very narrow. In those cases the evidence introduced was insufficient to support reasonable conclusions that defendant, after plaintiffs were in imminent peril, could have avoided injuring plaintiffs. Vietmeier v. Voss, Mo.Sup., 246 S.W.2d 785; Claridge v. Anzolone, 359 Mo. 65, 220 S.W.2d 33; Yeaman v. Storms, 358 Mo. 774, 217 S.W.2d 495; Thomas v. Aines Farm Dairy, Mo. App., 257 S.W.2d 228.

■ In the instant case, there was evidence tending to show that the lights on either side of Keber illuminated an area to the extent of forty feet around the intersection. We have related the evidence that defendant's automobile was moving in an alignment to the left of that of the Bierman car. We also bear in mind there was evidence tending to show that plaintiff was standing motionless near the center of the street. There were grounds for the reasonable inferences that, when defendant was approaching the intersection and the point of collision, plaintiff was standing in a position within approximately five feet of the center line of Broadway and that defendant, moving throughout the distance of approximately one hundred feet in approaching the point of collision, had he looked to the left of the Bierman car, could have seen plaintiff standing, bent over, and looking down at the pavement or westwardly toward the cemetery. Plaintiff's position and posture out in the street were substantiated by the testimony of the nightwatchmen, and we note that defendant testified that plaintiff ran eastwardly "coming from the white line." Defendant's testimony (as well as the testimony of other witnesses) was for the jury. The jury could believe all or none of it, or accept it in part and reject it in part, as the jurors found it to be true or untrue in relation to the other testimony and facts and circumstances of the case.

■ In our examination of the question whether plaintiff made out a submissible case, we accord plaintiff the benefit of defendant's testimony tending to support the inferences that plaintiff was in a position of imminent peril standing near the middle of the street, and we reject the inference supported by defendant's testimony (but unfavorable to plaintiff's theory of submission) that plaintiff was running eastwardly. It is the rule that we must take plaintiff's evidence as true, where it is not entirely unreasonable or opposed to physical laws, and give him the benefit of all favorable inferences arising from all the evidence and reject unfavorable inferences. A cause may not be withdrawn from the jury unless the facts in evidence and the legitimate reasonable inferences which may be drawn therefrom are so strongly against plaintiff as to leave no room for reasonable minds to differ. Smithers v. Barker, 341 Mo. 1017, 111 S.W.2d 47; Holmes v. McNeil, 356 Mo. 763, 203 S.W.2d 665; De Lay v. Ward, Mo.Sup., 262 S.W.2d 628.

■ As stated, there was substantial evidence supporting the theory that plaintiff was standing out near the middle of the street where he could have been seen by defendant when defendant was approaching throughout the distance of one hundred feet or more from the point of collision; it reasonably could be said plaintiff's position and posture denoted his obliviousness to any and all danger; and it reasonably could be found that defendant could have swerved to the right, or slackened speed and swerved to the right, and thus could have avoided the collision well within such distance. It is unnecessary to demonstrate mathematically that defendant could have so acted in avoiding the casualty within the stated distance. When defendant had slackened speed and stopped his vehicle after the collision, plaintiff was lying only

ten or twelve feet to the rear of defendant's car. We are of the opinion that the evidence was substantial in tending to show humanitarian negligence of defendant in failing to swerve to the right, or to slacken speed and swerve to the right, as submitted. The questions as to the time and place when and where defendant in looking could and should have seen and realized plaintiff was in imminent peril, and whether thereafter defendant could have averted the casualty were jury questions. The trial court did not err in overruling defendant's motion for a directed verdict, and in giving plaintiff's principal verdict-directing Instruction No. II.

Nor did the trial court err in refusing to give defendant's Instruction D, which instruction was designed to withdraw the issue of humanitarian negligence in failing to "slacken" speed. There was some evidence introduced tending to show that defendant could have avoided injuring plaintiff by (merely) slackening speed, but this issue was not submitted to the jury. As we have said, plaintiff's case was submitted in Instruction No. II on humanitarian negligence in failing to swerve, or to slacken speed *and* swerve. The second of the alternative submissions in the instruction, that is, "or by slackening the speed of his said automobile and swerving said automobile to the right"—a single submission of two acts in combination constituting, in given circumstances, negligent conduct—was a proper submission in this case wherein there was evidence to support it. Frandeka v. St. Louis Public Service Co., Mo. Sup., 234 S.W.2d 540. An instruction withdrawing the issue of slackening speed might have confused or misled the jury with respect to the second alternative submission which submitted, as stated, slackening speed *and* swerving. It has been said the better practice is to tell the jury what the issues are rather than to tell them what issues are not. Kleinlein v. Foskin, 321 Mo. 887, 13 S.W.2d 648. Ordinarily, it is not error to refuse a withdrawal instruction. The giving or refusal of a withdrawal instruction is a matter within the sound discretion of the trial court; however, if a withdrawal instruction would confuse the jury upon the issues of the cause as submitted, such instruction should not be given. Melton v. St. Louis Public Service Co., 363 Mo. 474, 251 S.W.2d 663.

At plaintiff's request the trial court gave Instruction No. V, as follows,

"The Court instructs the jury that if under the evidence and the instructions of the Court you find that the defendant was negligent, as submitted to you in Instruction No. II, and that such negligence of the defendant directly contributed to cause the casualty mentioned in evidence and that plaintiff was thereby injured, then the Court instructs you that the fact that plaintiff's own conduct directly contributed to his own injury is no defense in this case."

Plaintiff's Instruction No. II did not have the "tail" clause informing the jury to the effect that if they found humanitarian negligence as submitted, plaintiff's contributory negligence was not a defense, or that negligence of plaintiff which only contributed to his injury did not defeat plaintiff's recovery. However, the Instruction No. V was not erroneous, in our opinion, merely because the advice was not contained in a clause appendant to Instruction No. II. All of the instructions given by the trial court are to be read, considered, and construed as a whole. In this humanitarian rule case it is technically correct that, if the jury found defendant was negligent as submitted in plaintiff's humanitarian rule Instruction No. II, plaintiff would be entitled to recover even though he had failed to exercise ordinary care in getting into a position in the street where he was in imminent peril, because, if the essential factual elements of plaintiff's humanitarian rule case were found to exist, plaintiff's negligence could only be antecedent contributory negligence which is not a defense. This court has held it proper in a humanitarian negligence case to inform the jury that contributory negligence of plaintiff is not a defense or that negligence of plain-

tiff which only contributed to or concurred in his injury does not defeat his recovery. Smithers v. Barker, supra, 341 Mo. 1017, 111 S.W.2d 47. This very subject has been carefully examined and explained in Crews v. Kansas City Public Service Co., 341 Mo. 1090, at pages 1100–1102, 111 S.W.2d 54, at pages 59–60.

We hold that the trial court did not err in giving plaintiff's Instruction No. V.

We now turn to contentions of error of the trial court in ruling objections during the argument of counsel. Defendant's counsel, Mr. Evans, had argued as follows,

"Now, on the basis of this fact, that claim that they have made that Mr. O'Leary was guilty of negligence, they come in here and ask you for twenty-five thousand dollars. * * *

"Now, before you give him twenty-five thousand dollars, I ask you sincerely, will you look at Mr. O'Leary's side of the case? Will you judge him by all of the evidence in this case of what he did or didn't do? He's going home, ten thirty at night, not an undue hour. He's got his wife and his little granddaughter with him. He's driving like you and I would. Suddenly an emergency situation arises."

And plaintiff's counsel in his closing argument urged the following,

"* * * Mr. Evans says if you find in favor of the plaintiff and award him damages, consider Mr. O'Leary's side of the case. The only thing for you to consider is two things. The plaintiff, in order to recover in this case, has to show by a mere preponderance of the evidence that Mr. O'Leary, the man driving the car, was negligent. If so, the plaintiff is entitled to his damages. In determining the amount of his damages, you are not to consider Mr. O'Leary. That is not in this case. It is entirely and completely immaterial in this case."

It will be seen that during the argument, defendant's counsel said, "Suddenly an emergency situation arises." Plaintiff's counsel objected on the ground that "injecting into this case the question of an emergency situation is highly improper under a humanitarian submission. It is beyond the course of this evidence, outside of the record, and is improper under the law." The objection, at first overruled, was later sustained, and the jury was told to disregard the remark.

In Teague v. Plaza Exp. Co., 354 Mo. 582, 190 S.W.2d 254, it was said the submission of the circumstance of sudden emergency as a factor in determining the reasonable character of a defendant's choice of action necessitates the hypothesizing of conduct of defendant prior to his movement into the position where the hypothesized emergency arose, in order that it would be found that the sudden emergency was not caused by his own tortious conduct. Because of this field of inquiry into conduct antecedent to the emergency, it is thought that in a submission of humanitarian negligence no "sudden emergency" situation should be considered as isolated, and hypothesized. Defendant's responsibility for his conduct in whatever emergency exists in the facts of a humanitarian rule case is determined by the rule itself, and the situation is to be considered from the time and after plaintiff is in imminent peril. In the Teague case, however, this court was careful to note it was not intending to say that any fact or circumstance obtaining at the time or after the humanitarian rule seizes upon the situation could not be urged by counsel and considered by the jury in determining whether a defendant exercised the applicable degree of care in averting a casualty.

In the instant case, the terminology used by defendant's counsel in arguing to the jury that suddenly an emergency situation arose was unfortunate, and the trial court was technically correct in sustaining the objection; and yet we say, as we said in the Teague case, that defendant was en-

titled to urge any fact or circumstance, obtaining at the time and after the humanitarian rule was applicable to the situation, bearing upon the question whether thereafter defendant was or was not guilty of humanitarian negligence. But if it were assumed that the trial court erred in sustaining the objection, nevertheless, having examined the argument of defendant's counsel in its entirety, we are of the opinion that the trial court's action was not prejudicial. This, because defendant's counsel was permitted to argue and did fully argue defendant's theory of the effect of the relevant facts and circumstances as they bore upon the question whether defendant was guilty of humanitarian negligence as submitted.

■ It has been further observed in reading the excerpts from the arguments of counsel, which we have quoted supra, that plaintiff's counsel said, "In determining the amount of his damages, you are not to consider Mr. O'Leary. That is not in this case. It is entirely and completely immaterial in this case." Defendant's counsel objected to this argument, and stated that this "is a plain and unwarranted prejudicial attempt to inject insurance in the case." Defendant's counsel moved the court to declare a mistrial, and then requested that the jury be instructed to disregard the argument. The trial court overruled the motion and request stating, inter alia, "the argument is retaliatory." Herein defendant-appellant urges there could have been but one motive for this argument. It is said it is clear plaintiff's counsel wanted the jury to know without fail that defendant carried insurance and that the assessment of a large amount of damages was of no consequence whatever to him. But we are of the opinion that the trial court did not err in overruling the motion and request. We have considered the language of the argument by plaintiff's counsel, to which the objection was interposed, in its context and in its apposition as a reply to the argument of defendant's counsel. We now again refer to the argument of defendant's counsel when, after alluding to the amount

of damages claimed by plaintiff, counsel said, " * * * I ask you sincerely, will you look at Mr. O'Leary's side of the case? Will you judge him by all of the evidence in this case of what he did or didn't do? He's going home, ten thirty at night, not an undue hour. He's got his wife and his little granddaughter with him. He's driving like you and I would." Although, no doubt, defendant's counsel had no intention of unfavorably contrasting the personality and antecedent situation of defendant, who, with his wife and little granddaughter, was driving home "like you and I would," with the personality and antecedent situation of plaintiff, stupidly drunk out in the middle of the street, yet we think the argument of defendant's counsel justified a reply calling the attention of the jury to the real issues of the case.

■ We examine the question of the prejudicial effect of the language of argument, to which defendant's counsel objected, in its setting and also have a regard for the fact that the trial court must have considered the entire arguments of counsel for the adversary parties when the contended errors in argument as assigned in defendant's motion for a new trial were examined and such motion overruled. Douglas v. Twenter, Mo.Sup., 259 S.W.2d 353. We agree with the trial court that the language of plaintiff's counsel, to which objection was made, when considered in its context, could not reasonably have carried the implication or had the prejudicial effect which defendant-appellant ascribes to it. The language objected to did not plainly or unmistakably imply that whatever judgment plaintiff recovered would be satisfied by an insurer, as did the language in argument by counsel for the respective defendants in Davis v. F. M. Stamper Co., 347 Mo. 761, 148 S.W.2d 765; Buehler v. Festus Mercantile Co., 343 Mo. 139, 119 S.W.2d 961; and Rytersky v. O'Brine, 335 Mo. 22, 70 S.W.2d 538, cited by defendant-appellant. In Phillips v. Vrooman, Mo.Sup., 251 S.W.2d 625, cited by defendant-appellant, the trial court had *sustained* defendant's motion for a new trial on the specified ground of prejudicial

remarks of counsel for plaintiff and this court affirmed the new trial order.

The judgment should be affirmed.

It is so ordered.

COIL and HOLMAN, CC., concur.

PER CURIAM.

The foregoing opinion by VAN OSDOL, C., is adopted as the opinion of the court.

All of the Judges concur.