Marjorie SCHMITTZEHE and Hilary Schmittzehe, Appellants-Respondents,

v.

CITY OF CAPE GIRARDEAU, a Municipal Corporation, and Charles Banfield, Appellants-Respondents.

No. 47323.

Supreme Court of Missouri,

Division No. 2.

Sept. 14, 1959.

Motion for Rehearing and to Modify Opinion Denied Oct. 12, 1959.

Strom & Strom, Elmer A. Strom, Stephen E. Strom, Cape Girardeau, for plaintiffs-appellants.

Oliver & Oliver, Gerald B. Rowan, Cape Girardeau, for defendants-appellants.

STOCKARD, Commissioner.

In this action for damages resulting from an intersectional collision the jury returned a verdict in favor of plaintiff Marjorie Schmittzehe in the amount of $13,500 for personal injuries and in favor of her husband, Hilary Schmittzehe, in the amount of $7,500 for medical expenses and loss of services of his wife and for damages to his automobile.

The collision occurred at the intersection of Sprigg and Morgan Oak Streets in the City of Cape Girardeau on January 8, 1957, when the 1953 Ford automobile belonging to Hilary Schmittzehe and being operated by Marjorie Schmittzehe was struck by a Ford dump truck owned by the City of Cape Girardeau and being operated by its employee Charles Banfield in the course of his employment. The claim of Marjorie Schmittzehe was submitted to the jury on the alleged primary negligence of excessive speed or failure to maintain a lookout by Charles Banfield and on the alleged humanitarian negligence on his part in failing to slacken speed and swerve. The trial court sustained defendants' motion for a new trial on the ground that Marjorie Schmittzehe was guilty of contributory negligence as a matter of law and it was therefore error to submit her case on primary negligence. It is from this order that plaintiffs have appealed. The trial court also overruled defendants' motion to set aside the verdict and judgment and to enter judgment for defendants, and defendants have appealed from that order.

Plaintiffs filed a motion to dismiss the appeal of defendants on the ground that such appeal is not authorized by Section 512.020 RSMo 1949, V.A.M.S., which motion we must sustain because the order appealed from does not constitute a "final judgment" within the meaning of the statute. Gier v. Clark, Mo.Sup., 300 S.W.2d 519 [2, 3]; Stith v. St. Louis Public Service Co., 363 Mo. 442, 251 S.W.2d 693 [4], 34 A.L.R.2d 972; Schneider v. St. Louis Public Service Co., Mo.Sup., 238 S.W.2d 350 [8]; Bailey v. Interstate Airmotive, Inc., 358 Mo. 1121, 219 S.W.2d 333 [1], 8 A.L.R.2d 710. But, the effect of dismissing defendants' appeal is more academic than real. The basis of the purported appeal was that the trial court should have sustained their motion for a directed verdict because plaintiffs failed to make a submissible case under either primary or humanitarian negligence. These contentions were preserved in the motion for new trial, and in a situation precisely the same as here this court held that it would upon appeal by plaintiff from an order granting a new trial (after dismissing defendants' appeal from the order denying a motion to set aside the verdict and judgment and enter judgment in accordance with the motion for a directed verdict) examine the evidence to determine whether or not plaintiff made a case for the jury, and if the "record plainly shows plaintiff under the law and the evidence cannot recover, the parties should be spared the trouble and expense of another trial." Bailey v. Interstate Airmotive, Inc., supra, 219 S.W.2d at page 336.

The terms "plaintiff" and "defendant" when used in the singular shall refer to Marjorie Schmittzehe and Charles Banfield, respectively.

The collision occurred about 4:15 o'clock in the afternoon. The day was cloudy and hazy, and at the time it was misting rain and the streets were wet. The visibility was bad and a person could not "see too far." Each street was 40 feet in width. On Morgan Oak, west of the intersection, there was a stop sign located eight feet from the Sprigg Street curb. There was no stop sign for traffic moving north on Sprigg. On

the southwest corner of the intersection there was a gasoline service station extending 107 feet south of Morgan Oak. Plaintiff drove her husband's Ford east on Morgan Oak to the stop sign and stopped so that she was about even with it. Across the intersection, headed west on Morgan Oak, Paul Robert had stopped his automobile preparing to make a left turn and go south on Sprigg. Plaintiff testified that while she was stopped she looked to her left and then to her right, and because "it was so bad" she looked again. She could see to the "end of the filling station or a little ways past, probably 110 or 115 feet." There were no obstructions that would prevent her from seeing farther to the south, but she testified that "the weather, it was so bad, I couldn't see any farther." She saw no vehicle approaching from the south and she then put her car in "low," started forward and was "picking up speed." She did not again look to the south. When she was three-fourths of the way across Sprigg, and the front of her automobile was about even with the east curb line of Sprigg, and she had reached a speed of eight miles an hour, the right front part of the Ford dump truck operated by defendant struck the right rear wheel of her automobile. She did not see the dump truck before the collision and she heard no warning signal.

Defendant was present in the court room but did not testify, but plaintiffs introduced portions of his deposition as declarations against interest. He was hauling a load of crushed stone. The windshield wiper on the dump truck (there was only one) was working and the brakes were good. He could see "maybe two blocks" looking straight ahead, and he guessed that he could see one hundred and fifty feet at an angle "if you had an opening where you could see through." He did not remember seeing plaintiff at the stop sign, but he did see her pull out into the intersection when he was about 30 feet north of the south line of the service station. Before he entered the intersection he looked "kinda partially" to his left. He saw the Robert car stopped at the stop sign to his right when he was at the south line of the service station, but at that time he saw no cars moving or stopped on the left side. When he saw plaintiff's car he started to apply his brakes. He had no estimate whatever of her speed. He did not turn to the right because he would have been headed toward the Robert car, and he did not turn to the left because "I would still hit her, I imagine I would." There were no other cars in the intersection. He sounded no signal and all he did was to apply his brakes. From the time he put his foot on the brakes until he stopped he traveled "fifteen or twenty feet, something like that, from the time I hit the brakes maybe," but he "wouldn't have traveled over thirty foot at any one time." At 15 miles an hour, with the load he had and the weather conditions, he could stop in "about thirty feet" from the time he "hit the brakes."

Paul Robert testified that at the time plaintiff "began to go across and enter the intersection" he saw the truck coming north approximately at the south line of the service station, but he also stated that he was not testifying with exactness as to the relative positions of the vehicles at the time. He estimated the speed of the truck at 30 miles an hour, and it did not appear to change its speed or swerve.

The parties stipulated that the maximum speed limit was 25 miles per hour, and that, among other things, the ordinances of the City of Cape Girardeau provided that "The operator of any vehicle who has stopped as required by law in obedience to a stop sign at an intersection shall yield to other vehicles within the intersection or approaching so closely on the protected street as to constitute an immediate hazard, but said operator having so yielded may proceed, and other vehicles approaching the intersection on the protected street shall yield to the vehicle so proceeding into or crossing the protected street."

In a memorandum opinion the trial court set forth its reasons for concluding that plaintiff was negligent as a matter of law. He relied primarily on the testimony of

plaintiff that she could see to the south line of the service station and did not see the truck, but that Robert testified that he saw the truck at the south line of the service station as plaintiff "began to go across and enter the intersection." He then concluded that "If the testimony of Robert is to be believed then defendant driver was negligent in not seeing her [plaintiff] sooner but plaintiff cannot submit on that theory without showing she was free of negligence and to look and fail to see that which was clearly visible is negligence," and "it [defendant's truck] must have been within her range of vision for she testified she could see as far south as Robert could see. * * They were there at the same time, Robert looked and saw, she looked and didn't see."

█ In determining whether or not a submissible case was made on the theory of primary negligence or under the humanitarian rule we review the evidence from the standpoint most favorable to plaintiffs and give them the benefit of all reasonable inferences therefrom. Fenneren v. Smith, Mo.Sup., 316 S.W.2d 602 [3].

█ When plaintiff was stopped at the stop sign the front of her automobile was a little more than 40 feet from the east curb line of Sprigg Street. Plaintiff started from a stopped position and after traveling to the point of collision she was then traveling eight miles an hour. Her average speed was approximately four miles an hour. We realize that time cannot be computed accurately from average speed and a known distance, but it can furnish an approximation. It is also fair to say that plaintiff's speed probably was not at a uniformly accelerated rate but the first part was at a greater acceleration than the last, and that in figuring time it would probably be more accurate to use five or six miles an hour. The approximate time for plaintiff to reach the point of collision from the stop sign, at an average speed of five miles an hour was 5.4 seconds, and at an average speed of six miles an hour was 4.5 seconds. The only evidence of the speed of the truck was that it was traveling at an undiminishing speed of 30 miles an hour. Therefore, when plaintiff looked to the south from the stop sign the truck was necessarily in the neighborhood of 198 or 237 feet south of the point of collision, and farther away than plaintiff could see.

It is true that witness Robert testified that he saw the truck approximately 107 feet from the point of collision when plaintiff "began to go across and enter the intersection," but he qualified this estimate, it was not the most favorable evidence to plaintiff, and she was not bound by his estimates of the positions of the two automobiles when there was other evidence to contradict it.

We cannot agree that under the evidence most favorable to plaintiff she could and should have seen the truck when she looked from the stop sign, and therefore it cannot be said that she was negligent as a matter of law on the basis that she failed to see that which was clearly visible to her.

Defendants argue that plaintiff was negligent as a matter of law in failing to look again to her right as she drove into the intersection, and they cite Frandeka v. St. Louis Public Service Co., 361 Mo. 245, 234 S.W.2d 540; Burton v. Moulder, Mo.Sup., 245 S.W.2d 844; Branscum v. Glaser, Mo.Sup., 234 S.W.2d 626; Folluo v. Gray, Mo.App., 256 S.W.2d 273; and James v. Berry, Mo.App., 301 S.W.2d 530. While some of the facts in these cases are common to this case, there are in each some distinguishing features. This is not a situation of plaintiff looking and not seeing a plainly visible approaching vehicle in a position to constitute an immediate hazard, as in the Frandeka and Branscum cases, or of plaintiff seeing the approaching vehicle and trying to beat it across the intersection, as in the Burton and Folluo cases, or in failing to yield the right-of-way to a vehicle ap-

proaching so closely as to constitute an immediate hazard, as in the James case. In addition in all these cases the contributorily negligent driver did not have the right-of-way, except in the Frandeka case where the court held that the driver should have known that defendant was not going to yield the right-of-way. The question actually presented here is whether, considering the evidence in the light most favorable to plaintiff, the trial court should have ruled that plaintiff was guilty of contributory negligence as a matter of law in proceeding across the intersection without looking a second time to the right after she had looked from the stop sign and had seen no approaching vehicle.

■ It is, of course, the duty of a motorist entering an intersection to exercise the highest degree of care and to maintain a careful and vigilant lookout ahead and laterally ahead. He cannot drive blindly into the intersection, or rely solely on the fact that he has the right-of-way. Witt v. Peterson, Mo.Sup., 310 S.W.2d 857 [1, 3]. Neither does he fulfill the duty imposed upon him by stopping at a stop sign and then driving into the intersection without making proper observations to determine that there is no cross traffic in or so near to the intersection as to constitute an immediate hazard. 60 C.J.S. Motor Vehicles § 359c. In this case plaintiff stopped at the stop sign and looked, and for a distance of approximately 115 feet saw no approaching traffic. She then entered the intersection, and under the evidence favorable to her, the defendant was sufficiently far away that she properly appropriated the right-of-way, and she then had the right to proceed absent actual or constructive knowledge of the approach of other traffic which, in the exercise of the highest degree of care, she knew or should have known was not going to yield the right-of-way to her. She received no warning from defendant. While she had the duty to maintain a look-out ahead and laterally ahead she could not keep an uninterrupted

watch in two directions, she was not required to look constantly to one side, and she did not need to keep turning her head from side to side. 60 C.J.S. Motor Vehicles § 287. In addition, the Robert automobile was ahead of her, and even though stopped, it required at least some attention on her part.

Defendants argue that if plaintiff had looked to her right a second time just before she passed that point beyond which she could not have stopped short of the truck's path she could have avoided the accident by stopping and, therefore, she was negligent in not doing so. Perhaps a jury could so find, but we cannot say she was negligent as a matter of law. The front of her automobile traveled at least 20 feet after it entered the lane for northbound traffic. The length of the Ford, the width of the truck, and the point of impact indicate that the left side of the truck was close to the center of Sprigg Street. Allowing reaction time and a reasonable stopping distance plaintiff would have had to have seen the truck when she was at least 28 feet from the point of collision in order to have stopped short of the path of the truck. It took her almost 3 seconds to travel that distance. Therefore, in order to have stopped short of the truck's path she would have to have seen it when it was approximately 125 feet away. There was evidence that this was farther than she could see. But assuming she could have seen the truck, since she was then well into the intersection we could not say as a matter of law that at that distance she should have known that the truck was not going to yield to her the right-of-way which she had properly appropriated. Under these circumstances whether or not her failure to look a second time when defendants say she should was the proximate cause of the collision would certainly be a jury question.

When we take into consideration the fact that plaintiff did stop and look at the stop sign; that when she entered the inter-

section it could be found that she properly appropriated the right-of-way; that when she reached the last point where she could have stopped short of the path of the truck, the truck may not then have been visible to her, or if so, it was so far distant that she could then assume it would yield the right-of-way; and that the Robert automobile required at least some of her attention, we cannot say that plaintiff was negligent as a matter of law in failing to look to her right a second time, but under these circumstances we hold that her contributory negligence was a question for the jury. See Moore v. Southwestern Bell Telephone Co., Mo.Sup., 301 S.W.2d 817 [1]; Hoppe, Inc. v. St. Louis Public Service Co., 361 Mo. 402, 235 S.W. 2d 347 [1], 23 A.L.R.2d 846; Burke v. Renick, Mo.App., 249 S.W.2d 513[2, 3]; Dauber v. Josephson, 209 Mo.App. 531, 237 S.W. 149[3]; 60 C.J.S. Motor Vehicles § 353.

■ Defendants next contend that plaintiff did not make a submissible case under the humanitarian doctrine because there is no evidence from which it can be determined that defendant, by the exercise of the highest degree of care and with safety to himself could have avoided the collision after plaintiff entered into a position of imminent peril. Plaintiff submitted her case under the humanitarian doctrine in the conjunctive on failure to slacken speed and to swerve.

■■ Plaintiff was oblivious to the approach of the truck, and exactly when one enters into a position of imminent peril is a question for the jury to determine under the evidence in each case. Harrington v. Thompson, Mo.Sup., 243 S. W.2d 519 [1]. But, there must be substantial evidence from which the jury may make this determination. The zone of peril in this case commenced, and the duty of defendant under the humanitarian doctrine began when he saw or by the exercise of the highest degree of care should have seen that plaintiff was oblivious to

the danger and was intent on continuing across his path, Frandeka v. St. Louis Public Service Co., supra, 234 S.W.2d 547 [11, 12], or assuming there was no reasonable appearance of obliviousness, then when plaintiff was actually in the path of the truck or so close to it that it was apparent that she would not stop before reaching it. Smithers v. Barker, 341 Mo. 1017, 111 S.W.2d 47 [7]. The figures we have previously set out demonstrate that under the circumstances the jury could have found that plaintiff entered a zone of peril approximately 28 feet from the point of collision, and that at that time defendant was approximately 125 feet from the point of collision. Assuming the area of vision was not more than 115 feet, the jury could find that plaintiff was in a position of peril when defendant was that far away.

This was an "almost escaping case," and only a slight swerving of the truck to the left or a slackening of speed would have prevented the collision. There was no other traffic in the intersection. Defendant admits that he did not swerve, and there was evidence that he did not slacken his speed. It is necessary that there be evidence, either direct or circumstantial, that under the circumstances the speed of the truck could have been sufficiently slackened and that the truck could have been swerved to permit plaintiff to emerge from the zone of imminent peril. But, it must be recognized that in some situations "the facts speak for themselves without the aid of expert evidence, as where the evidence shows that the plaintiff's vehicle had but barely failed to get in the clear before the occurrence of the collision, so that only the least additional time would have enabled the plaintiff to make his escape." Woods v. Kurn, Mo. App., 183 S.W.2d 852, 856; Stith v. St. Louis Public Service Co., 363 Mo. 442, 251 S.W.2d 693, 698, 34 A.L.R.2d 972; Smith v. Thompson, 346 Mo. 502, 142 S. W.2d 70, 74; Marczuk v. St. Louis Public Service Co., 355 Mo. 536, 196 S.W.2d

1000, 1003. The brakes on the truck were in good operating condition and there was no traffic to prevent defendant from swerving to the left. Under the facts of this case, the jury, without resort to speculation and conjecture, reasonably could have inferred that after plaintiff was in a position of imminent peril defendant could have sufficiently slackened the speed of the truck and also could have swerved it sufficiently to the left so that by either action the collision could have been avoided. Plaintiff made a submissible case under the humanitarian doctrine.

Defendants contend that even though a submissible case was made under both primary and humanitarian negligence, the order granting a new trial should be affirmed because of error in two instructions.

■ Defendants first contend that instruction 2, submitting humanitarian negligence, was reversibly erroneous because it submitted that "Charles Banfield saw, or * * * could have seen the plaintiff in such position of imminent peril * * * in time thereafter, with the means and appliances at hand and with reasonable safety to himself, to said truck and other persons and vehicles nearby * * * to have sufficiently slackened the speed thereof *and swerved it to the left or right,* and that by so doing, he could have prevented the collision * * *" (emphasis added). Defendants contend that there is no evidence that the truck could have been swerved to the right with safety.

As previously set forth, plaintiff made a submissible case under the humanitarian doctrine for failing to slacken speed alone. This is not the situation discussed in Frandeka v. St. Louis Public Service Co., supra, where plaintiff did not make a submissible case on slackening speed alone or on swerving alone, but did make a submissible case on slackening *and* swerving. The submission here was on humanitarian negligence in the conjunctive in failing to slacken speed and failing to swerve. As-

suming that the ability of defendant to swerve to his right with safety was not supported by evidence, prejudicial error did not result from this conjunctive submission. Belisle v. Wilson, Mo.Sup., 313 S.W.2d 11 [5]. Defendants have not demonstrated that this instruction was prejudicially erroneous despite the conjunctive submission. See Glowacki v. Holste, Mo. Sup., 295 S.W.2d 135 [7].

■ Defendants challenge instruction 1, submitting primary negligence, because it submitted excessive speed and failure to maintain a lookout in the disjunctive, and they contend that there was no evidence to support a finding of failure to maintain a lookout. They argue that "the only evidence on the subject came from defendant who testified that he saw plaintiff stopped in a position of safety at the stop sign and had her under observation from that time until the time of the collision." We do not so read the testimony. Defendant said he did not see her at the stop sign but saw her first when she entered the intersection and when he was thirty feet north of the south line of the service station. But, notwithstanding this, the testimony favorable to plaintiff reasonably justified a finding by the jury that defendant never saw plaintiff until at the time of or immediately prior to the collision. Defendant was headed directly into plaintiff's car, but he did not swerve his truck, sound a warning, or slacken his speed. Within the time that he could have done these things plaintiff's car was clearly visible to him, and it is inconceivable that if he had seen plaintiff's automobile he would have proceeded without taking any action whatever. Certainly, the evidence supports a finding that defendant did not maintain an effective lookout.

The appeal of defendants is dismissed, and the cause is remanded to the trial court with directions to set aside the order granting a new trial, to reinstate the verdict of the jury and to enter judgment

thereon in the amounts of the verdict as of the date of its rendition.

BOHLING and BARRETT, CC., concur.

PER CURIAM.

The foregoing opinion by STOCKARD, C., is adopted as the opinion of the Court.

All concur.