Harry G. KINEALY, Plaintiff-Appellant,

v.

Marshall GOLDSTEIN and Koppel Furniture Company, Inc., a Corporation, Defendants-Respondents.

No. 32056.

St. Louis Court of Appeals.

Missouri.

Feb. 15, 1966.

Koenig & Dietz, F. Daley Abels, Henry C. Stoll, St. Louis, for plaintiff-appellant.

Heege & Heege, George F. Heege, Clayton, for defendants-respondents.

ANDERSON, Judge.

Plaintiff, Harry G. Kinealy, sought in this action to recover $10,000 for personal injuries and property damages alleged to have resulted from a collision on Delmar Boulevard near its intersection with Academy Avenue, between plaintiff's 1960 Chevrolet pickup truck and a motor vehicle operated by defendant, Marshall Goldstein, alleged to be driving said vehicle at the time as agent and servant of defendant, Koppel Furniture Company, Inc. Upon trial, plaintiff's case was submitted solely upon the alleged negligence of defendant Goldstein under the humanitarian doctrine in failing to warn, slacken the speed and swerve his motor vehicle after said defendant saw or by the exercise of the highest degree of care could have seen plaintiff in a position of peril. There was a ver-

dict for defendant, and plaintiff has appealed from the judgment entered on said verdict.

Appellant contends that the trial court committed errors in instructing the jury. Respondents, in their brief, while denying all specific errors claimed, assert that plaintiff failed to make a case for the jury of the alleged negligence submitted. We will therefore make a full statement of the facts uncovered at the trial bearing on this issue, and in deciding the matter consider only that evidence and the inferences therefrom most favorable to plaintiff.

The collision in question occurred Monday morning, October 16, 1961, at approximately 8:20 a. m., on Delmar Boulevard near Academy Avenue. Plaintiff at the time was operating a 1961 Chevrolet pickup truck eastwardly on Delmar. He drove onto Delmar at Union Boulevard, which street was, according to his testimony, approximately four blocks west of Academy. He intended to turn left at Academy. Academy ends on the north side of Delmar. There are two sets of streetcar tracks in the center of Delmar, one for eastbound streetcars and one for those westbound. Between the rails of the track there is brick paving so that the area of the tracks can be and is used by automobile traffic. Midway between the two sets of tracks are two parallel white painted lines marking the center of the street. Delmar has, counting the area of the streetcar tracks, six traffic lanes. Adjacent to the streetcar tracks on Delmar there are what is referred to in the evidence as concrete safety zones near Academy, one on the east side of the intersection for use in connection with westbound streetcars and one on the west side for eastbound. According to plaintiff's testimony the one on the west was about "a few feet" west of the intersection; the exact distance is nowhere shown. Plaintiff also testified that it was "right at the car tracks" with "very little" room between it and the nearest rail of the streetcar tracks. The exact distance between the concrete safety zone and said track is not shown, but from the photographs in evidence it appears to be two or three feet. This concrete structure is several feet high and cone shaped. The end facing east is flat and from there tapers toward the west where it comes to a point. The length of this structure is not shown. It appears from the photograph in evidence that there is an area east of this concrete structure, referred to as a pedestrian island which is obviously intended for use by persons waiting to board streetcars. West of the concrete structure, there are white painted lines which extend from each side of the concrete structure and meet forming a triangle. The length of this area is not shown. From the point of this area to the west is a painted white line. On the concrete structure there were, at the time, red and yellow blinking warning lights.

Plaintiff testified that as he proceeded east on Delmar, the left wheels of his truck were north of the south rail of the eastbound track and the right wheels south of said rail; that when he was approximately 100 feet from the pedestrian island, he looked into his rear-vision mirror and observed another vehicle quite a distance to his rear, then turned on his left turn blinker light, and proceeded; that when he was "maybe 50 feet" from the pedestrian island, he turned toward the north to straddle the eastbound track; that he had turned "not very far" when his truck was struck on the side; that the truck was thrown sideways and he was thrown about in the cab of the truck; that the rear end of his truck came to rest against the concrete abutment; that the truck that hit him came to rest facing north; that at the time of the impact both front wheels of his truck were in the eastbound streetcar tracks, and the truck was at a slight angle; that he looked at the truck that collided with him and observed that the whole front of it on the right side was completely wrecked; that the part of his (plaintiff's) truck which was involved in the collision was the left side of the cab at the door and where the spare wheel and tire was attached to the truck behind the

door; that the spare wheel and tire were all torn up.

Plaintiff further testified that the speed of his truck at the time he started to turn left was about 20 miles per hour; that thereafter, he reduced the speed to 15 miles per hour; that his speed at the time of impact was approximately 10 or 15 miles per hour. He explained that the reduction in speed was "because I had only 50 or 75 feet to go to see if I could make a left turn."

Plaintiff offered no evidence as to where the truck driven by defendant, Goldstein, was at the time he turned toward his left or its speed at said time. Likewise, he offered no evidence as to how far he traveled after turning to the left before reducing his speed or how far he traveled after turning to the left before the collision occurred being content with the answer "not very far." Nor was there any evidence by plaintiff as to how far his truck was pushed sideways by the force of the collision.

On cross-examination, plaintiff testified he did not know if the motor vehicle he saw to his rear at the time he turned on the left turn signal was the one being driven by defendant, Goldstein, or whether it was a car rather than a truck. Defendant, Goldstein, was driving an English Ford Truck called a Thames. Plaintiff stated he did not know if the motor vehicle he saw behind him was the one involved in the accident. He further stated he did not know how far behind him this vehicle was when he observed it; that he never saw the truck driven by defendant, Goldstein before the collision; neither did he know where said truck came from nor its speed and position in the street prior to the collision; that he knew his left turn signal was working on the dashboard, but did not know "if they were working outside;" that he was going about 15 miles per hour when he was struck; that he would have run into the island had he not turned left; that part of his truck was over both rails of the eastbound streetcar track at the time of the collision, and his truck was at a slight angle. At this point, plaintiff's attention was called to his deposition wherein he testified that no part of his truck was north of the north rail at the time of the collision, whereupon plaintiff changed his testimony stating that the account in the deposition was, "the way it happened."

Plaintiff further testified that his truck was pushed against the curb of the island, meaning no doubt that it was pushed against the concrete structure. He further testified that he looked to the rear only once, and that was when he was about 100 feet from the island. He stated that he was not aware of any westbound traffic as he was driving east, stating as a reason for his unawareness that "I had not approached Academy yet."

Plaintiff offered certain questions and answers from a deposition of defendant Marshall Goldstein. By said answers said defendant testified that he lived at 8145 Blanca Drive, University City, Missouri, and was employed by defendant Koppel Furniture Company as a salesman; that at the time of the accident, he was coming from his home and was going to Koppel's office location in downtown St. Louis at 815 Franklin Avenue; that he was president of the Koppel Company; that the weather on the occasion in question was dry and clear; that the traffic on Delmar was normal for that time (8:30 a. m.); that he "imagined" there was more eastbound traffic than westbound; that the collision was to the north of the island approximately at the streetcar tracks; that the impact took place 4 or 5 feet west of the island; that he had been traveling in the same traffic lane while driving in the 5100 block of Delmar, which was the lane of the streetcar tracks; that he would say the left side of his truck was approximately six inches north of the eastbound tracks; that he first saw plaintiff's truck before the collision when it was about 10 feet from him; that he could not remember whether there were any cars to the right of plaintiff's truck at the time; that his maximum speed in the 5100 block

was 25 miles per hour, which was about the speed of the other traffic; that the speed of plaintiff's truck was about the same as his when he first saw it; that when both vehicles came to rest after the collision there was no space between them—they were definitely together; that the right front door of his truck was damaged, the glass in the windshield shattered and the front end of the right side caved in; that at the moment of impact his truck was completely to the right of the center of the street; that it was the collision which changed the direction of his automobile; that he did not remember if there were three lanes of traffic on this occasion; that when he said plaintiff's truck was ten feet in front of him he meant that the rear end of plaintiff's truck was approximately ten feet from the front of his vehicle; that there was no reason why he had not seen plaintiff's truck before—he said, "I didn't pay any attention to him"; the first time he had any reason to see plaintiff's truck was when he observed plaintiff turn left about 4 feet from the island.

Norman Weston, a police officer, was called as a witness for plaintiff. He testified he investigated the accident in question. Using his report of the accident to refresh his memory, the witness testified the report showed the truck driven by defendant, Goldstein, was owned by defendant, Koppel Furniture Company; that in a police investigation such information is not acquired from an inspection of a car registration, but is as reported by those at the scene of the accident, which was the method used in the instant case.

On cross-examination, he stated that his recollection, as refreshed by the police report, was that the accident occurred about 112 feet west of Academy; that plaintiff told him he was driving east on Delmar with one set of wheels in the streetcar tracks and the other on the asphalt pavement and, as he approached the concrete abutment, he saw defendant's automobile in his rearvision mirror and thinking it far enough behind him he pulled out and as he

did so was struck by someone. The witness further testified he did not recall plaintiff saying anything to him about giving directional signals; that the collision occurring 112 feet west of Academy would have been at the west end of the island as shown in the photograph in evidence; that plaintiff did not indicate whether he was going to turn left into Academy, or go straight through the intersection; that his report indicated that both vehicles were going straight ahead, and that plaintiff's vehicle turned or swerved to avoid an object or pedestrian, and the Thames skidded after an application of its brakes.

On redirect examination, he testified he believed he measured the skid marks made by the Goldstein truck; that the length of the skid marks was not shown on his report, and he had no independent recollection of their length; that the only skid marks present were those made by the Goldstein truck.

On recross-examination, the officer stated he took a statement from defendant, Goldstein, in which the latter said he was driving east on Delmar in the center lane and plaintiff's vehicle was alongside and in front of him; that plaintiff's vehicle suddenly swerved to the left and he could not avoid hitting plaintiff's truck.

Lawrence Neil Goldstein, son of defendant, Marshall Goldstein, was called as a witness for the defendants. He was a passenger in the truck driven by his father. He testified that the traffic on Delmar, at the time, was not light, but medium; that his father drove the truck in the lane of the eastbound streetcar rails, and to the left of the island; that as he approached the area of the island, he noticed a pickup truck headed for the island, swerve left in front of his father's truck; that no signal was given by the pickup truck before it swerved; that the driver's side of plaintiff's truck and the right side of the Thames came together; that when the pickup truck swerved, the Thames was only a matter of feet behind it, but witness was unable to say the exact distance; that he

was not paying that close attention, "but just saw him swerve."

On cross-examination, the witness testified that as the Thames was being driven eastwardly prior to the collision its left wheels were two or three feet from the white center line and between said center line and the north rail of the eastbound streetcar tracks; that most of the automobile traffic was eastbound; that he did not remember if there was westbound traffic; that he did not remember if the Thames had passed any other automobile from Union Boulevard to the point of collision; that they were traveling at about the same speed as the traffic to the right; that he did not remember if there was traffic to their right all the way in said block; that he could not say accurately as to the speed of the Thames because he was not driving, but it was somewhere between 30 and 35 miles per hour; that he saw the pickup truck a few feet before the collision as it passed; that it was in front of them just before the collision; that just before the impact, he noticed plaintiff coming alongside of them; that he did not remember how far from the island that occurred, but it was, "not too far from the island"; that he could not tell how far from Academy or the island they were when he first saw plaintiff; that he was unable to judge plaintiff's speed immediately before the collision; that he really could not say whether plaintiff was going faster or slower; that he first noticed plaintiff as plaintiff came alongside and going ahead of them; that if plaintiff had continued the way he was going, he would have run into the abutment.

Defendant, Goldstein, testified that at the time of the accident, he was coming from his home and going to his place of business; that within a block from the place of collision, the traffic was normal for that time of morning; that the weather conditions were fair, and visibility good; that as he approached the area where the accident occurred, he was traveling about 25 or 30 miles per hour; that at the time

in question, the left wheels of his truck were about one foot from the center line of the street, and the right wheel was inside the eastbound streetcar tracks; that there was traffic to his rear; that he did not change lanes from Union to the place of accident; that he did not believe there were any vehicles in front of him; that there was a pickup truck alongside of him, directly in line with the island, and that when it got to within six or ten feet of the abutment, it swerved to the left; that he applied the brakes as soon as he saw what was happening, but it was too late—his truck hit the pickup truck; that both vehicles were moving at the time of the impact; the distance between the rear of the pickup truck and the front of the Thames when the pickup truck moved to the left was at the most, ten feet; that the collision took place about 4 feet west of the island; that he did not recall seeing any skid marks at the scene of the accident; that he saw no signal from the pickup truck before it swerved; that if the pickup truck had gone straight ahead, it would have hit the island; that at the time the pickup truck turned left, he (Goldstein) was traveling somewhere around 25 miles per hour; that the Thames was facing east after the accident; and the pickup truck was facing toward the north; that when the pickup truck was ahead or alongside of him, it was directly in line with the island and its left wheels were south of the south rail of the streetcar tracks; that the right front door of the Thames came in contact with the left door and a small portion back of the door of the pickup truck.

On cross-examination, defendant, Goldstein, testified there was traffic to his right as he traveled in the block where the collision occurred; that he did not recall sounding his horn prior to the accident, or swerve, but did apply his brakes before the collision; that the brakes took effect before the collision; that he was about a car length behind the other car when he applied his brakes; that the average car length was anywhere from 15 to 30 feet; that as far

as he could recall it may have been less than 15 to 30 feet behind the other vehicle when the brakes took effect; that the other car was 15 to 30 feet or less forward when he applied the brakes, whatever the average car length is; that he recalled seeing plaintiff heading for the island and he started applying his brakes for some reason, he did not recall; that plaintiff was where the white markers come to a junction to form a "Y" at the time he applied the brakes; that when plaintiff got approximately to that point, plaintiff swerved; that when plaintiff was in that vicinity, he was approximately a car length behind plaintiff, and plaintiff swerved at which time he first became aware that plaintiff was headed for the abutment; that prior to that time he saw plaintiff in the street in front of him, and off to the right; that before swerving, plaintiff made no unusual movement to attract his attention; that plaintiff could possibly have gone to the right; that he did not remember if there was traffic to the right; that he did not remember if there was any westbound traffic at that time; that plaintiff's speed at that time was about the same as his; that he did not reduce the speed of his car before the impact because there wasn't time to do so; that he did not know if his car skidded; that the actual impact was about at the point of the island; that the distance he traveled from the time he applied his brakes until the impact was the distance he was behind plaintiff's truck; that plaintiff was moving, but he did not recall if he stopped; that plaintiff did not reduce his speed, unless plaintiff jammed on his brakes; that he did not recall seeing anything like that; that plaintiff was at an angle when he struck plaintiff; that the fact that plaintiff's truck was heavier than his was the reason his truck stopped; that plaintiff's truck was standing crossways of the streetcar tracks when it came to rest with its rear end close to the concrete abutment; that plaintiff's truck was clear across the streetcar tracks; that his position with reference to the center line was

approximately the same as it had been before the collision; that he did not recall having driven to the left at all; that he did not think that he knocked plaintiff's vehicle forward by the impact or knock around the rear end; that plaintiff must have been crosswise of the street before the impact, very close to a ninety degree angle; that the collision was somewhat of a sideswipe as well as a direct collision; that plaintiff's truck actually hit his truck at the right front corner and the side of the door.

 The first and basic fact in the imposition of liability under the humanitarian doctrine is the position of imminent peril. Banks v. Morris & Co., 302 Mo. 254, 257 S.W. 482. Such peril must be certain, immediate and impending. It must not be remote, uncertain or contingent; and a mere likelihood or bare possibility of injury is not sufficient to create imminent peril. Wilson v. Toliver, 365 Mo. 640, 285 S.W. 2d 575.

 It is only when such peril arises that the humanitarian doctrine imposes the duty to thereafter exercise the highest degree of care to avoid injury and this without regard to antecedent negligence. Ornder v. Childers, Mo., 327 S.W.2d 913; Downing v. Dixon, Mo.App., 314 S.W.2d 927.

 One is chargeable with notice that another is in peril, as that term is defined by the authorities, and with a duty to act only when the reasonable appearances indicate said basic fact. Faught v. Washam, Mo., 329 S.W.2d 588; Wilson v. Toliver, Mo., 305 S.W.2d 423.

 For that reason, the position of imminent peril must be determined from the facts and circumstances in each particular case. Such position may be proved by circumstantial evidence considered in the light most favorable to plaintiff's case. Hendrick v. Kurn, 352 Mo. 848, 179 S. W.2d 717, and is a jury question but only

if there is evidentiary basis from which a jury could reasonably make such finding, Paydon v. Globus, Mo.App., 255 S.W.2d 61; Affirmed, 262 S.W.2d 601. Schmittzehe v. City of Cape Girardeau, Mo., 327 S.W.2d 918.

■ What we have said applies to the other necessary elements of a humanitarian case, and in that connection, there must be borne in mind the rule that the humanitarian doctrine does not require a defendant to save plaintiff at the expense of himself and others. Pennington v. Carper, Mo., 309 S.W.2d 596.

■ Also if the defendant lacks the time to avert the accident, or if there is insufficient distance available to avoid harm to plaintiff with the means at hand, after the latter's position of peril arises, the defendant may not be subjected to liability. Paydon v. Globus, Mo.App., 255 S.W.2d 61; Affirmed, 262 S.W.2d 601.

The zone of peril in this case, and the duty of defendant, Goldstein, under the humanitarian doctrine, could only arise when he saw or by the exercise of the highest degree of care should have seen that plaintiff was oblivious of the approach of defendant's truck and exhibited an intent to enter the path of defendant's truck at a time when to do so was dangerous. Schmittzehe v. City of Cape Girardeau, Mo., 327 S.W.2d 918; Frandeka v. St. Louis Public Service Co., Mo., 234 S.W.2d 540, or if there were no reasonable appearances of obliviousness, then plaintiff came into a position of peril when he was actually in the path of defendant's truck or so close to it that it was apparent that he would or could not stop before reaching it. Smithers v. Barker, 341 Mo. 1017, 111 S.W.2d 47. In the case at bar, plaintiff, while traveling to the right of the path of defendant's truck, gave no indication that he intended to swerve into defendant's lane prior to the time he actually began the turning movement.

■ Although plaintiff had turned on his left turn light when 100 feet from the pedestrian island, he had traveled 50 feet thereafter before turning left. During that period, he traveled at a rate of speed much slower than that of defendant, Goldstein. It would, therefore, seem that the reasonable appearances would lead one to believe that plaintiff intended to permit Goldstein to pass before turning. Goldstein had the right to act upon reasonable appearances. It was not incumbent on him to speculate that plaintiff would disregard the rules of safety and place himself in a position of danger of being struck by the faster moving vehicle in the lane to his left. Under the facts and circumstances, one placed in Goldstein's position, would have the right to assume that plaintiff would not do so, and that the safest thing to do was to continue forward with undiminished speed in order to facilitate the passing. There was no evidentiary basis for finding the position of peril that arose prior to the time plaintiff began his turn to the left, which under the most favorable evidence was 50 feet from the pedestrian island and 46 feet from the place where the collision occurred. It was when plaintiff started to turn left that Goldstein's duties under the humanitarian doctrine arose. Any failure to warn or take affirmative action prior thereto can only be classified as primary negligence not to be considered in ascertaining if plaintiff made a case under the humanitarian doctrine.

Plaintiff, in his brief, attempts to locate the Goldstein truck at 96 feet from the point of impact at the time plaintiff came into a position of peril. There is no basis in the evidence for such a finding.

The only evidence in the case as to where the Goldstein truck was at the time plaintiff started his left turn was given by the defendant, Goldstein. He first testified that the distance between the rear of the pickup truck and the front of the Thames he was driving was 10 feet at the time plaintiff moved to the left, and that he applied the brakes on his truck as soon as he saw

what was happening. On cross-examination, he testified that his truck was about a car length behind plaintiff's truck when he applied the brakes and that the average car length was anywhere from 15 to 30 feet. Plaintiff was entitled to the benefit of Goldstein's testimony in fixing the position of the Thames truck at the time he entered the position of peril and taking that testimony in its most favorable aspect to plaintiff's case, we will disregard his estimate of a car's length and take it that Goldstein meant to say on cross-examination that he was thirty feet from plaintiff's truck when the latter made his turn to the left. This would put Goldstein 76 feet from the point of collision.

If the Goldstein truck was traveling 30 miles per hour, it was covering roughly 44 feet a second. Considering three-fourths of a second for reaction time, the Goldstein truck traveled 33 feet before the brakes could take effect leaving a distance of 43 feet for the brakes to reduce its forward motion to the extent that no collision would have occurred. But there was no evidence of the time and space that would have been required for this to occur.

■ We cannot take judicial notice of the time or distance a motor vehicle can be slackened to avoid an object in its path. To bring a moving vehicle to a stop or to slacken its speed, its energy must be used up or reduced by friction. It is a matter for expert testimony based upon many factors, such as speed, the size and weight of the vehicle, its load, the condition of the brakes, the condition of the road and its gripping efficiency which depends in a great measure upon its composition. One made familiar with all these conditions and who has had experience in stopping and reducing the speed of motor vehicles of the kind in question under the conditions shown to exist is qualified to render an expert opinion on the subject. Usually the owner and operator who is familiar with the vehicle and has driven it under the conditions shown is qualified to supply this opinion. Without such testimony, except in rare instances not here present, a humanitarian case cannot be made on failure to slacken as was attempted in this case. Plaintiff's case on alleged failure to slacken was not made. In the absence of such evidence, a verdict for plaintiff would necessarily be based on speculation and conjecture. See Steuernagel v. St. Louis Public Service Co., Mo.App., 202 S.W.2d 516; Affirmed by Supreme Court in 357 Mo. 904, 211 S.W.2d 696.

Plaintiff also failed to make a humanitarian case of failure to warn. When plaintiff entered a position of peril, the front end of Goldstein's truck was 76 feet from the point of collision. If Goldstein was traveling 25 miles per hour, he was going roughly 38 feet a second. If his speed was 30 miles per hour, he was traveling roughly 44 feet per second. He was therefore two seconds or less in point of time from the point of impact when plaintiff entered a position of peril. Allowing defendant three-fourths of a second reaction time to realize plaintiff's dangerous situation and to sound a warning, and allowing plaintiff three-fourths of a second to respond thereto, there would remain only one-half second or less for the means plaintiff might employ to operate to avoid the collision. Only by dissecting a second of time into fractions and by speculation and conjecture could a jury find that the injury could have been avoided by a warning. This is especially true since this was not an "almost escaping" case. See Claridge v. Anzolone, 359 Mo. 65, 220 S.W.2d 33.

Plaintiff also failed to make out a humanitarian case on failure to swerve. In order to make such a case, it was incumbent on plaintiff to show that Goldstein could have swerved without injury to himself or his passenger. Plaintiff failed to do this by showing that the traffic lanes to Goldstein's right or those to his left were free from traffic in a space where Goldstein could have swerved into to avoid the collision without danger of collision with other vehicles. In appellant's brief, it is

stated that the evidence shows there was no westbound traffic; nor eastbound traffic in the lane immediately next to him. This is a misstatement. The evidence does not so show. Plaintiff failed to make a case of failure to swerve.

Our conclusion is that plaintiff failed to make a case on the issues submitted. For that reason, it will not be necessary to rule the other points urged.

The judgment is affirmed.

WOLFE, P. J., and RUDDY, J., concur.